Case Nos. 14-2006, 14-2050, 14-2101

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

GREGORY THOMAS BERRY, et al.
Plaintiffs/Appellees,

and

LEXISNEXIS RISK & INFORMATION
ANALYTICS GROUP, INC., et al.
Defendants/Appellees,

v.

ADAM E. SCHULMAN, MEGAN CHRISTINA AARON and the Aaron
Objectors, and SCOTT HARDWAY and Hardway Objectors,
Parties-in-Interest/Appellants.

Appeal from the United States District Court
Eastern District of Virginia
Honorable James R. Spencer, District Court Case No. 3:11-cv-754

## PLAINTIFFS / APPELLEES' RESPONSE BRIEF

Michael A. Caddell
Cynthia B. Chapman
**CADDELL & CHAPMAN**
1331 Lamar, Suite 1070
Houston, TX 77010
Telephone: 713.751.0400
Facsimile: 713.751.0906
*Co-Lead Counsel for Plaintiffs /
Appellees*

William W. Wilkins
Kirsten E. Small
Andrew A. Mathias
**NEXSEN PRUET**
55 E. Camperdown Way, Suite 400
Greenville SC 29601
Telephone: 864.282.1199
Facsimile: 864.477.2699
*Co-Lead Counsel for Plaintiffs /
Appellees*

# **TABLE OF CONTENTS**

I.    Statement of Issues ........................................................1

II.   Statement of the Case ....................................................2

   A.   This settlement represents the culmination of an extensive
        campaign to achieve FCRA rights and remedies for the hundreds
        of millions of consumers whose Accurint reports are routinely sold
        to debt collectors. ..................................................2

      1.   Plaintiffs' allegations in this litigation.......................2

      2.   Predecessor litigation alleging Accurint FCRA violations.........2

   B.   Ground breaking Settlement guaranteeing Class members
        FCRA protection through sweeping practice changes is achieved. ......4

   C.   Settlement provides each Class with significant, valuable relief..........5

      1.   23(b)(2) Settlement Class: overhaul of the Accurint
           reporting system finally endows Class members with
           FCRA rights ................................................6

         a.   The Class Definition and Relief .......................6

         b.   The release of claims is narrowly drawn to preserve
              claims for actual damages...............................7

         c.   Though not required, notice was still provided to
              23(b)(2) Class. ........................................7

         d.   Valuation of the injunctive relief and attorneys' fees ......8

      2.   Rule 23(b)(3) Settlement Class: Class members receive at
           least $300 without filing a claim................................9

         a.   The Class Definition and Relief .......................9

         b.   The Release of Claims...................................9

      3.   No government authority objected to the Settlement, and
           the vast majority of Class members support the Settlement.....10

   D.   The Settlement was extensively vetted. ............................11

III.    Standard of Review.......................................................................12

IV.    Summary of Argument ..............................................................13

V.    Argument ....................................................................................16

    A.    Because the Settlement is an excellent result for the Classes, this Court should affirm the district court's finding that it is fair, reasonable, and adequate. ...........................................16

    B.    The District Court's certification of the 23(b)(2) class was proper...................................................................................18

        1.    The Settlement appropriately releases 23(b)(2) Class members' claims for statutory damages, which are incidental to injunctive relief, while preserving individual actual damage claims.....................................................19

            a.    Unlike in *Wal-Mart*, Plaintiffs' statutory damages are not individualized. ...................................20

            b.    Precluding release of statutory damage claims under Rule 23(b)(2) would create a formidable barrier to dispute resolution........................................25

            c.    The scope of the release is reasonable and preserves all claims for individual actual damages. ......................25

        2.    The parties had the power to agree to, and the district court to order, the Settlement's injunctive relief. ....................27

        3.    The 23(b)(2) Class was adequately represented because all Class representatives and Class members had the same interest in securing the injunctive relief. ........................31

            a.    The interests of 23(b)(3) and 23(b)(2) Class members are aligned....................................................32

            b.    The service awards and attorneys' fees awarded were appropriate and created no conflict between Class representatives or counsel and the Class. ............35

    C.    The Contact & Locate product provides valuable relief to the Class and creates an obligation via court order that confers on the Class a future right to sue should LexisNexis alter the product to violate FCRA..................................................................37

1.   The Settlement Agreement and the district court's
     Injunctive Relief Order forbid including
     FCRA-covered information in Contact & Locate. ..................38

2.   Nowhere in the Settlement Agreement does the Class
     release its right to sue LexisNexis over the Contact &
     Locate product...........................................................................41

3.   The Settlement creates a future right to sue should the
     Contact & Locate product ever include
     "seven-characteristic" data.......................................................42

4.   The Settlement Agreement assures Class members that
     they may sue third-party users who use Contact & Locate
     Data for FCRA-governed purposes. ..........................................42

5.   The Settlement's provisions regarding Contact & Locate
     give Class members more rights in the future, not fewer. ........43

D.   The district court acted well within its discretion in awarding
     the injunctive relief fee.........................................................................43

     1.   The Proper Standard of Review: Abuse of Discretion ............44

     2.   The injunctive relief fee award is amply supported by the
          time spent and result achieved. ...............................................45

          a.   Evidence of the time and labor expended supports
               the lodestar fee award. ....................................................45

          b.   No authority supports the exacting requirement
               Schulman attempts to impose on district courts to
               audit billing records in hour-by-hour detail...................48

          c.   The injunctive relief fee is reasonable in light of
               Class Counsel's skill and the results obtained...............49

          d.   The awarded multiplier is reasonable in light of
               the excellent results achieved. ........................................50

VI.  Conclusion ......................................................................................................53

# TABLE OF AUTHORITIES

## CASES

*Adams v. LexisNexis Risk & Information Analytics Group, Inc.*,
    No. 08-4708 (D.N.J. 2008) .................................................................2

*Allison v. Citgo Petroleum Corp.*,
    151 F.3d 402 (5th Cir. 1998) ............................................... 20–21

*Amara v. CIGNA Corp.*,
    775 F.3d 510 (2d Cir. 2014) ................................................ 22–23

*Ass'n for Disabled Americans, Inc. v. Amoco Oil Co.*,
    211 F.R.D. 466 (S.D. Fla. 2002)............................................ 15, 24

*Barel v. Bank of Am.*,
    255 F.R.D. 393 (E.D. Pa. 2009) ...................................................29

*Beverly v. Wal-Mart Stores, Inc.*,
    No. 3:07-cv-00469 (E.D. Va. May 1, 2009)...................................28

*Black v. Winn-Dixie Stores, Inc.*,
    No. 3:09-cv-502 (M.D. Fla. June 17, 2011) ..................................29

*Bolin v. Sears, Roebuck & Co.*,
    231 F.3d 970 (5th Cir. 2000) .......................................................28

*Boyd v. Coventry Health Care Inc.*,
    299 F.R.D. 451 (D. Md. 2014) ....................................................44

*Broussard v. Meineke Discount Muffler Shops, Inc.*,
    155 F.3d 331 (4th Cir. 1998) .......................................................34

*Calfinao v. Yamasaki*,
    442 U.S. 682 (1979).....................................................................27

*Carroll v. Wolpoff & Abramson*,
    53 F.3d 626 (4th Cir. 1995) .........................................................44

*Chakejian v. Equifax Info. Servs., LLC*,
    275 F.R.D. 201 (E.D. Pa. 2011) ..................................................29

*Christ v. Beneficial Corp.*,
    547 F.3d 1292 (11th Cir. 2008) ...................................................28

*Conley v. First Tenn. Bank, N.A.*,
No. 1:10-cv-01247 (E.D Va. Aug. 18, 2011) ................................28

*Cook v. Niedert*,
142 F.3d 1004 (7th Cir. 1998) ......................................................36

*DeBoer v. Mellon Mortg. Co.*,
64 F.3d 1171 (8th Cir. 1995) ........................................................37

*Denney v. Deutsche Bank AG*,
443 F.3d 253 (2d Cir. 2006) .........................................................33

*Dollar Tree Stores, Inc. v. Norcor Bollingbrook Assoc., LLC*,
699 F. Supp.2d 766 (E.D. Va. 2009) ............................................49

*Domonoske v. Bank of Am., N.A.*,
790 F. Supp. 2d 466 (W.D. Va. 2011).........................................36

*Farrar v. Hobby*,
506 U.S. 103 (1992).....................................................................49

*Flinn v. FMC Corp.*,
528 F.2d 1169 (4th Cir. 1975) ......................................................12

*Fox v. Vice*,
__ U.S. __, 131 S. Ct. 2205, 2216 (2011) ...................................48

*Frahm v. United States*,
492 F.3d 258 (4th Cir. 2007) ........................................................44

*Fresco v. Automotive Directions, Inc.*,
No. 03-cv-61063, 2009 WL 9054828,
(S.D. Fla. Jan. 20, 2009) ..............................................................24

*Fuges v. Sw. Fin. Servs. Ltd.*,
707 F.3d 241 (3d Cir. 2012) .................................................. 39–40

*Geneva Rock Prods., Inc. v. United States*,
___ Fed. Cl. ___, No. 08-9202, 2015 WL 358925,
(Fed. Cl. Jan. 27, 2015) ...............................................................51

*Goode v. First Advantage LNS Screening Solutions, Inc.*,
No. 2:11-cv-02950 (E.D. Pa. Dec. 29, 2014) ..............................28

*Graham v. LexisNexis Risk & Information Analytics Group, Inc.*,
No. 3:09-CV-00655-JRS (E.D. Va. 2009) ....................................3

*Gunnells v. Healthplan Servs., Inc.*,
    348 F.3d 417 (4th Cir. 2003) ................................................................ 32–35

*Harris v. Equifax Info. Servs.*,
    No. 6:06-cv-01810, 2007 WL 1862826,
    (D.S.C. June 26, 2007) .........................................................................27

*Hecht v. United Collection Bureau, Inc.*,
    691 F.3d 218 (2d Cir. 2012) ..............................................................31

*Holmes v. Continental Can Co.*,
    706 F.2d 1144 (11th Cir. 1983) ........................................................36

*In re Dry Max Pampers Litigation*,
    724 F.3d 713 (6th Cir. 2013) ............................................................36

*In re Jiffy Lube Sec. Litig.*,
    927 F.2d 155 (4th Cir. 1991.) ............................................... 12, 14, 16

*In re Literary Works in Electronic Databases Copyright Litigation*,
    654 F.3d 242 (2d Cir. 2011) ............................................... 35, 41

*In re Pet Food Prods. Liab. Litig.*,
    629 F.3d 333 (3d Cir. 2010) ............................................................33

*In re Sw. Airlines Voucher Litig.*,
    No. 11 C 8176, 2013 WL 5497275,
    (N.D. Ill. Oct. 3, 2013) .....................................................................52

*James v. Experian Info. Solutions Inc.*,
    No. 3:12-cv-00902 (E.D. Va. Dec. 8, 2014) ...................................28

*Johnson v. Meriter Health Servs. Employee Ret. Plan*,
    702 F.3d 364 (7th Cir. 2012) ............................................................21

*Jones v. Southpeak Interactive Corp of Del.*,
    __ F.3d __, No. 13–2399, 2015 WL 309626,
    (4th Cir. Jan. 26, 2015) ....................................................................45

*Kay Co. v. Equitable Prod. Co.*,
    749 F. Supp. 2d 455 (S.D. W.Va. 2010) ........................................45

*Kehoe v. Fidelity Fed. Bank & Trust*,
    421 F.3d 1209 (11th Cir. 2005) ........................................................22

*King v. Gen. Info. Servs., Inc.*,
    No. 2:10-cv-06850 (E.D. Pa. Nov. 4, 2014) ...................................28

*Local Number 93 v. City of Cleveland*,
  478 U.S. 501 (1986)............................................................................28

*Lukenas v. Bryce's Mountain Resort*,
  538 F.2d 594 (4th Cir. 1976) ...........................................................31

*Milbourne v. JRK Residential Am., LLC*,
  No. 3:12-CV-861, 2014 WL 5529731,
  (E.D. Va. Oct. 31, 2014)...................................................................32

*Moore v. Verizon Commc'ns Inc.*,
  No. C 09-1823 SBA, 2014 WL 588035,
  (N.D. Cal. Feb. 14, 2014) ................................................................51

*Morey v. Louis Vuitton N. Am., Inc.*,
  No. 11CV1517 WQH BLM, 2014 WL 109194,
  (S.D. Cal. Jan. 9, 2014)....................................................................51

*Murray v. Auslander*,
  244 F.3d 807 (11th Cir. 2001) .........................................................21

*Newport News Shipbuilding & Dry Dock Co. v. Holiday*,
  591 F.3d 219 (4th Cir. 2009) ...........................................................48

*Perdue v. Kenny A.*,
  559 U.S. 542 (2010)..........................................................................51

*Plyler v. Evatt*,
  902 F.2d 273 (4th Cir. 1990) ........................................... 45, 47, 53

*Redman v. RadioShack Corp.*,
  768 F.3d 622 (7th Cir. 2014) ...........................................................48

*Richards v. Delta Air Lines*,
  453 F.3d 525 (D.C. Cir. 2006)..........................................................31

*Robinson v. Equifax Info. Servs., LLC*,
  560 F.3d 235 (4th Cir. 2009) ...........................................................49

*Robinson v. Gen. Info. Servs., Inc.*,
  No. 2:11-cv-07782 (E.D. Pa. Nov. 4, 2014)....................................29

*Roe v. Intellicorp Records, Inc.*,
  No. 1:12-cv-02288 (N.D. Ohio June 5, 2014).................................29

*Ryals v. Hireright Solutions, Inc.*,
    No. 3:09-cv-00625 (E.D. Va. Dec. 21, 2011)................................................28

*S.C. Nat'l Bank v. Stone*,
    749 F. Supp. 1419 (D.S.C. 1990) ...................................................................27

*Safeco Ins. Co. of Am. v. Burr*,
    551 U.S. 47 (2007)...........................................................................................16

*Sapp v. Experian Info. Solutions, Inc.*,
    No. 2:10-cv-04312 (E.D. Pa. May 15, 2013) .................................................29

*Serrano v. Sterling Testing Sys., Inc.*,
    711 F. Supp. 2d 402 (E.D. Pa. 2010).............................................................29

*Singleton v. Domino's Pizza, LLC*,
    976 F. Supp. 2d 665 (D. Md. 2013)................................................................33

*Soutter v. Equifax Information Servs., LLC*,
    498 F. App'x. 260 (4th Cir. 2012)..................................................................23

*Stillmock v. Weiss Markets, Inc.*,
    385 F. App'x. 267 (4th Cir. 2010)..................................................................24

*Sullivan v. DB Invs., Inc.*,
    667 F.3d 273 (3rd Cir. 2011) ..........................................................................27

*Sykes v. Mel S. Harris & Assocs. LLC*,
    __ F.3d __, No. 13-2742-CV, 2015 WL 525904,
    (2d Cir. Feb. 10, 2015)...................................................................................32

*Thorn v. Jefferson-Pilot Life Ins. Co.*,
    445 F.3d 311 (4th Cir. 2006.) ................................................................. 12, 22

*Wal-Mart Stores, Inc. v. Dukes*,
    __ U.S. __, 131 S. Ct. 2541 (2011) ................................................. 14, 19–20

*White v. Experian Info. Solutions, Inc.*,
    No. 05-CV-1070-DOC (C.D. Cal. Aug. 19, 2008) ........................................29

*Williams v. First Nat'l Bank*,
    216 U.S. 582 (1910)........................................................................................27

*Young v. Katz*,
    447 F.2d 431 (5th Cir. 1971) ..........................................................................13

## STATUTES

15 U.S.C. § 1681a(d) ....................................................................... 7, 39

15 U.S.C. § 1681b ..............................................................................6

15 U.S.C. § 1681e(b) ................................................................... 7, 17

15 U.S.C. §§ 1681g ..........................................................................17

15 U.S.C. § 1681g(a) ........................................................................7

15 U.S.C. § 1681i ..............................................................................17

15 U.S.C. § 1681i(a) ..........................................................................7

15 U.S.C. § 1681m ...........................................................................17

15 U.S.C. § 1681n ...................................................................... 16, 22

15 U.S.C. § 1681q .............................................................................43

28 U.S.C. § 1715 ..............................................................................10

## OTHER AUTHORITIES

*40 Years of Experience with the Fair Credit Reporting Act: An FTC Staff Report with Summary of Interpretations* (July 2011)....................................40

## RULES

FED. R. CIV. P. 23(b)(2)............................................................. 14, 19, 30

FED. R. CIV. P. 23(h)........................................................................44

FED. R. CIV. P. 54(c).........................................................................30

# I.   STATEMENT OF ISSUES

1.     Plaintiffs alleged LexisNexis violated "clearly established" law by making consumers' personal information available in its Accurint database without affording protections under the Fair Credit Reporting Act (FCRA) and sought statutory damages for willful violation of the FCRA. Citing a Federal Trade Commission statement that Accurint was not in fact subject to the FCRA, LexisNexis denied the law was "clearly established" and accordingly denied liability for statutory damages. Plaintiffs nonetheless achieved a settlement that will net $300 to every consumer who contacted LexisNexis about his or her Accurint report and provide all consumers extensive, valuable FCRA and other rights concerning their personal information in LexisNexis products going forward.

- Did the district court abuse its discretion in finding that the Settlement was fair, reasonable, and adequate?

2.     The district court certified two classes—a damages class under Rule 23(b)(3) and an injunctive relief class under Rule 23(b)(2). All members of the injunctive relief class obtained the same relief: an injunction requiring LexisNexis to comprehensively overhaul its business practices to protect consumers' personal information.

- Did the district court abuse its discretion in certifying the injunctive relief class under Rule 23(b)(2)?

3.     The district court awarded fees for the injunctive relief on a lodestar basis. Finding that counsel achieved in this "large and complex" litigation an "excellent" result that provided "substantial benefits for over 200 million

consumers," the district court awarded $5.3 million in attorneys' fees, representing a 1.88 multiplier on the time invested by counsel to secure the injunctive relief.

- Did the district court abuse its discretion in awarding attorneys' fees for the injunctive relief?

## II. STATEMENT OF THE CASE

**A. This settlement represents the culmination of an extensive campaign to achieve FCRA rights and remedies for the hundreds of millions of consumers whose Accurint reports are routinely sold to debt collectors.**

### 1. Plaintiffs' allegations in this litigation

Filed November 2011, this is the third national class action filed by Class Counsel against LexisNexis concerning the Accurint for Collections database. (App'x 18–19.) Plaintiffs asserted that LexisNexis violated the FCRA by selling certain Accurint brand reports—containing substantial detailed personal and credit information—to debt collectors without affording FCRA protections. (*Id.*) Because LexisNexis does not treat the reports as FCRA-governed, consumers are subject to the unlawful sale of their information to third parties and deprived of, *inter alia*, the right to obtain a full copy of their LexisNexis reports and dispute (and have corrected) inaccurate information contained in those reports. (*Id.*) In response, LexisNexis has consistently maintained that FCRA does not apply to Accurint reports. (App'x 2860.)

### 2. Predecessor litigation alleging Accurint FCRA violations

Class Counsel pursued two earlier cases, *Adams v. LexisNexis Risk & Information Analytics Group, Inc.*, No. 08-4708 (D.N.J. 2008) and *Graham v. LexisNexis Risk & Information Analytics Group, Inc.*, No. 3:09-CV-00655-JRS

– 2 –

(E.D. Va. 2009), both of which raised claims similar to Plaintiffs' claims here. While neither case resulted in classwide relief and each was voluntarily dismissed, Class Counsel, armed with valuable discovery and information from both *Adams* and *Graham*, filed this action to continue their pursuit of classwide relief on behalf of consumers affected by LexisNexis' Accurint data policies. (App'x 1694.) As they did in *Adams* and *Graham*, Class Counsel conducted both formal and informal discovery, including deposing witnesses, serving and responding to written discovery, and reviewing substantial information and documents. (*Id.*)

While Class Counsel has remained steadfast in their belief that LexisNexis' Accurint reports constituted "consumer reports" under FCRA, they were also compelled to acknowledge the risks associated with this position. (App'x 2115.) Of particular concern to Class Counsel is a 2008 Federal Trade Commission (FTC) letter stating that LexisNexis' Accurint reports are not "consumer reports" and, therefore, not regulated by FCRA.[1] In *Adams*, while the court denied LexisNexis' motion to dismiss and allowed additional discovery, it also stated that as long as the FTC held to its position that Accurint reports did not constitute "consumer reports" under FCRA, summary judgment would be entered for LexisNexis.[2] (App'x 2370 ("At the end of the day if what you say is so, that there is no other

---

[1] FTC Opinion Letter to Marc Rotenberg at 1 n.1 (July 29, 2008), *available at* http://www.ftc.gov/os/caselist/0523094/080801reedrotenbergletter.pdf.

[2] Given that the FTC was at the time the agency principally charged with enforcement of FCRA, the *Adams* court understandably accorded significant weight to the letter.

contrary authority [to the FTC Opinion Letter], then it seems to me summary judgment will be entered in the defendant's favor."); App'x 2788–2790.)

## B.  Ground breaking Settlement guaranteeing Class members FCRA protection through sweeping practice changes is achieved.

Over the last six years of litigating *Adams*, *Graham*, and this case, the Parties have met—face-to-face—for nine separate mediation conferences, supervised by one of two federal judges or a national mediator well known for his FCRA and complex litigation expertise. (App'x 1696–98.) The Parties also conducted numerous telephone conferences that ultimately led to this Settlement. (*Id.* 1697.)

Monetary relief was never the focus. (*Id.* 1696.) At every meeting, the Parties discussed the business practice changes they believed were necessary to resolve FCRA claims related to the Accurint database and delved painstakingly into each Accurint product, report by report, and, in some instances, data field by data field. (*Id.* 1696–97.)

The Parties' discussions focused on radical modifications to LexisNexis' reporting business with respect to debt collectors, including the implementation of certain FCRA-like rights connected to reports that ordinarily would not have such rights. (*Id.* 1697.) Judge Lauck directly supervised the settlement process by conducting telephone conferences to keep abreast of the case status. (*Id.* 1697–98.) In January 2013, the Parties attended a settlement conference with Judge Lauck. (*Id.* 1698.) At the 3.5 hour conference, each side gave a substantive presentation, and Judge Lauck asked pointed questions regarding the details of the Settlement.

– 4 –

(App'x 1698–99.) The conference culminated with Judge Lauck's supportive comments:

> . . . I can tell you personally that I think you all have worked something out that is very difficult. I do think it is a sea change and a good one and a thoughtfully conducted one. On behalf of [the] sets of individuals involved, this does strike me both as a set of circumstances where you all have worked hard to see what's fair, to give up on some things you may not wish to have given up on, but then also sort of seeing the horizon, the commonsensible approach that's going to have to come at one point or another, and it would not be exactly what everybody wants. And so I think you've worked very hard, and it's evident in what you're presenting to me, and I think it will be quite evident to Judge Spencer, too.

(*Id.* 1923.) Plainly, this Settlement resulted from hard-fought, arm's-length, and meaningful negotiations.

## C.   Settlement provides each Class with significant, valuable relief.

The Settlement includes two Classes—(1) the Rule 23(b)(2) Class, including the "Impermissible Use" class defined in the Complaint, approximately 200 hundred million consumers who will significantly benefit from the substantial business practice changes while still preserving claims for actual damages, and (2) the Rule 23(b)(3) Class, defined in the complaint as the "File Request" and "Dispute" classes, approximately 31,000 consumers who requested copies of or disputed the accuracy of their Accurint reports, indicating they were impacted by LexisNexis' refusal to comply with FCRA. The 23(b)(3) Class members release all claims for monetary damages.

– 5 –

1.    *23(b)(2) Settlement Class: overhaul of the Accurint reporting system finally endows Class members with FCRA rights*

### a.    The Class Definition and Relief

In its Order Granting Final Approval, the district court certified the following Class of consumers under Rule 23(b)(2):

> [A]ll persons . . . about whom information exists in the Accurint® Database from November 14, 2006 to the date when the Court enters its Preliminary Approval Order [April 26, 2013]. . . .

(App'x 624, 1721, 2885.) The district court found certification "appropriate because the injunctive relief sought is indivisible and applicable to all members of the Rule 23(b)(2) class." (*Id.* 2877.)

As explained in the Settlement Agreement, LexisNexis will split what is now Accurint for Collections into two newly developed products, each containing different sets of information. (*Id.* 1731.) One product, "Collections Decisioning," will be treated as falling within FCRA's "consumer report" definition. (*Id.* 1731.) The other product, "Contact & Locate," which does not fall within the ambit of FCRA, will nonetheless provide consumers with FCRA-like rights, such as the right to obtain a free copy of their Contact & Locate reports once per year and the right to submit clarifying information for phone numbers and addresses provided in Contact & Locate reports. (*Id.* 1733–1738; Supp. App'x 3058–59, 3061–75.)

LexisNexis customers who are granted access to the Collections Decisioning product will now be permitted to use the information only if they certify a permissible purpose under 15 U.S.C. § 1681b. (App'x 1732–33.) Moreover, Class members will now be able—at no cost—to request and review their consumer files.

15 U.S.C. § 1681g(a). Class members will also be able to dispute the accuracy of their information and have inaccurate information corrected, and LexisNexis will be required to follow reasonable procedures to assure "maximum possible accuracy" of reported information. 15 U.S.C. §§ 1681i(a), 1681e(b).

Since the Contact & Locate product does not fall within FCRA's "consumer report" definition, it will provide only certain, agreed-upon categories of data and will restrict the uses of such data. (App'x 1734.) The information in this product will not contain any of the "seven characteristic" information bearing on eligibility for things like credit, 15 U.S.C. § 1681a(d). (*See id.*)

### b.    The release of claims is narrowly drawn to preserve claims for actual damages.

Under the Settlement, while members of the 23(b)(2) Settlement Class release any remedies they may have for willful violations of FCRA and the ability to pursue future claims using the class action procedural device, significantly, they do not release *any* individual actual damage claims they may have for LexisNexis' FCRA violations. (App'x 1742–44.) Thus, 23(b)(2) Class members will retain their full rights to sue LexisNexis for individual actual damages caused by violations of FCRA or state-law equivalents. (*Id.* 2878, 1742–43.)

### c.    Though not required, notice was still provided to 23(b)(2) Class.

Unlike the mandatory notice requirements of 23(b)(3), notice is optional for classes certified under 23(b)(2). Nonetheless, the Parties proposed, and the Court approved, a comprehensive, national published notice program for the 23(b)(2)

Settlement Class, which managed to reach approximately 75.1% of potential Class members. (App'x 2860–61.)

### d.    Valuation of the Injunctive Relief and Attorneys' Fees

The significant business changes to which the Settlement obligates LexisNexis constitute a substantial, nationwide program of injunctive relief, aptly described as "a shift," "an earthquake within the market," (*Id.* 651), causing Professor Neil Richards, an internationally renowned privacy expert, to value the injunctive relief "in the billions of dollars." (*Id.* 587.) Quantifying just one component, Professor Richards multiplied the number of Accurint reports sold in one year (20 million) by the dollar amount ($8) consumers were previously charged for (incomplete) copies of their reports, which are now available free with *complete* FCRA-mandated information under the Settlement. (*Id.* 587–88.) Put another way, Class members will collectively save approximately $160 million annually and actually receive more information. (*Id.*)

In addition, LexisNexis' cost to design, implement, and operate the injunctive relief is substantial, exceeding $6 million and requiring at least 43,000 hours of human effort. (Supp. App'x 3057.) These costs include, among other things, costs for engineering the new products, preparing sales and operational teams for the launch, developing the credentialing process, and developing training programs. (*Id.*)

Concerning injunctive relief attorneys' fees and expenses, the district court awarded $5.5 million, to be paid separately by LexisNexis, less than a 1.88 multiplier on Class Counsel's lodestar. (App'x 2882–83, 2886, 2697–2700.)

2.    *Rule 23(b)(3) Settlement Class: Class members receive at least $300 without filing a claim.*

### a.    The Class Definition and Relief

The district court also certified under Rule 23(b)(3) a Class of consumers who "requested a copy of an Accurint® report about themselves or initiated or submitted a dispute or other inquiry regarding any Accurint® report . . . " (App'x 1746–47, 2885.) These 31,000 individuals are consumers who contacted LexisNexis and sought specific, FCRA-like protections regarding Accurint reports concerning their financial information. (App'x 639–40.)

LexisNexis will create a $13.5 million fund to compensate the 23(b)(3) Settlement Class, (*id.* 1751), which will be distributed pro rata to approximately 31,000 Class members—approximately $300 per person after attorneys' fees. (App'x 2868–69.) LexisNexis also undertook the full costs of notice and settlement administration. (App'x 1751, 1767.) The common fund includes any court award of attorneys' fees and costs[3] and does not revert to LexisNexis except that funds not claimed by Class members may be used to repay the 23(b)(3) notice expenses. (App'x 1751, 1755.) Any funds remaining after those costs are repaid will be distributed according to a Court-approved *cy pres* award. (App'x 1755.)

### b.    The Release of Claims

In exchange for a cash payment from the common fund, 23(b)(3) Class members will release Defendants and related persons from all claims relating to

---

[3] While the Parties agreed Class Counsel could seek as much as 30% of the 23(b)(3) common fund, Class Counsel requested 25% ($3,375,000), which is what the district court awarded. (App'x 1700, 1753–54, 2886.)

"any and all conduct or activity of the Defendants challenged by Named Plaintiffs in the Litigation relating to the characterization of any Accurint Reports as a 'consumer report' under FCRA and any related alleged violations of the FCRA." (*Id.* 1716, 1756.) The breadth of the release is justified by the fact that 23(b)(3) Class members will receive a cash payment—which is appropriate to compensate them for actual damages they suffered, since these consumers were sufficiently affected to contact LexisNexis regarding their Accurint reports. (*See* App'x 639–40.)

### 3.     *No government authority objected to the Settlement, and the vast majority of Class members support the Settlement.*

The district court appropriately found that the reaction to the 23(b)(2) Settlement—from federal and state authorities and Class members—weighed in favor of awarding the Settlement final approval.

As required by the Class Action Fairness Act of 2005, notice of the proposed settlement was provided to all interested federal and state governmental authorities. 28 U.S.C. § 1715. Not a single governmental entity objected to the proposed settlement, which is particularly notable given that the injunctive relief affects as many as 200 million consumers.

Reaction from Class members has also been overwhelmingly positive. With a Class of approximately 200 million people, 75% of whom received notice, only nine interested parties filed objections to the Rule 23(b)(2) Settlement with the district court or with the Parties. (App'x 2862.) Of these nine, seven are *pro se* objectors—only one, Adam Schulman, joins in this appeal. (*Id.* 2862.) The other

– 10 –

two parties, represented by counsel and joining in aspects of Schulman's appeal, each seek to represent a group of Class members defined in the district court as the Aaron objectors and the Cochran objectors—both groups carry with them an unfortunate and questionable history.[4] Yet, even treating these attorney-driven objector groups as valid, the percentage of objectors remains infinitesimal at .00014 percent.

## D. The Settlement was extensively vetted.

This Settlement has been extensively and thoughtfully vetted. Following a lengthy presentation, Judge Lauck—who acknowledged the meaningful impact of the injunctive relief as well as the extraordinary effort such business practice changes required—remarked that the settlement was indeed a "sea change," and the product of hard work and difficult negotiations. (App'x 1786–1924, 1923.) Thereafter, on April 26, 2013, following a full hearing at which the Settlement and

---

[4] Ms. Aaron purports to represent 20,206 objector "clients" (the Aaron objectors). As set forth in the Parties' Joint Motion to Correct Misrepresentations of the Watts Guerra, L.L.P. Objector Group, however, it is highly questionable at best whether the approximately 20,206 "clients" genuinely object to the Settlement, or whether they were misled into signing on to what has been improperly and inaccurately represented to them as simply a cash grab. (*See* Dkt. No. 83.) Similarly, professional objector and lawyer Edward Cochran submitted objections on behalf of 7,289 individuals he purported to represent (defined for the purposes of this appeal as the Hardway objectors). (*See* App'x 2547–52.) Notably, neither Watts Guerra nor Ed Cochran, both of whose histories and motives were questioned in detail at the district court level, are listed as counsel for the Aaron and Hardway objector groups in this appeal.

– 11 –

substantial supporting evidence was presented,[5] the district court preliminarily approved the Settlement. (*Id.* 611–24.)

As the final step of their many-year effort, Plaintiffs submitted extensive briefing and evidence in support of final approval. On September 5, 2014, following an all-day hearing at which counsel for the Classes, LexisNexis, and Objectors presented argument, the Court awarded the Settlement final approval, issued its detailed Injunctive Relief Order, and granted Class Counsel's Motion for Attorneys' Fees. (*Id.* 2859–97.)

### III.   STANDARD OF REVIEW

The Court applies a deferential standard to its evaluation of class action settlements, reviewing them only "to determine whether there was 'a clear showing that the district court abused its discretion.'" *In re Jiffy Lube Sec. Litig.*, 927 F.2d 156, 158 (4th Cir. 1991) (quoting *Flinn v. FMC Corp.*, 528 F.2d 1169, 1172 (4th Cir. 1975)). The district court's factual findings are subject to clear error review. *Thorn v. Jefferson-Pilot Life Ins. Co.*, 445 F.3d 311, 317–18 (4th Cir. 2006). Engaging in this "narrow" scope of review, the Court's role is not "to 'substitute [its] ideas of fairness for those of the district judge.'" *Flinn*, 528 F.2d at 1172. That is because, as the Court has recognized, "[t]he action of the District Court (in affirming the settlement) is presumptively right." *Id.* at 1172 n.3 (quoting *Young v.*

---

[5] The Parties submitted extensive briefing, including Plaintiffs' lengthy PowerPoint Presentation and detailed declarations from privacy expert Professor Richards and LexisNexis' Product Management Director, Tom Sizer, who together provided the Court with the precise details of the injunctive relief as well as its overall impact, value, and cost. (App'x 576–97; Supp. App'x 3055–172.)

*Katz*, 447 F.2d 431, 433 (5th Cir. 1971) (parenthetical in original)). The Court's power to reverse an approved settlement is therefore limited solely to those instances where the district court's decision is "clearly shown to have been wrong." *Id*.

## IV.    SUMMARY OF ARGUMENT

This Settlement represents an outstanding, against-all-odds result for the Class. Despite LexisNexis' substantial defenses to Plaintiffs' statutory damage claims, which imposes the burden of proving a "willful" FCRA violation, Class Counsel managed to achieve a Settlement that affords approximately 200 million Americans—essentially every adult who applies for any kind of credit transaction—full FCRA protections for the personal information LexisNexis collects and sells to debt collectors. In addition, consumers will gain additional, FCRA-like protections, including the right to obtain their reports and comment on any inaccuracies, even for basic name and address information not covered by FCRA. Remarkably, before this Settlement, millions of consumers had no way of even *realizing* that LexisNexis was collecting and marketing personal information about them. Now, they will be able to get free copies of their reports, correct any inaccuracies, and bring claims for actual damages if LexisNexis fails to follow reasonable procedures to ensure "maximum possible accuracy" of the information.

And for those 31,000 consumers who did realize—after perhaps losing a job or mortgage opportunity—that they were the subject of an Accurint report and, therefore, contacted LexisNexis to request a copy of their report or to try to make corrections, recovery for a 23(b)(3) Class provides meaningful monetary

compensation—approximately $300—in a check mailed to every Class member with no requirement to even file a claim.

In a case hinging on Plaintiffs' ability to prove the Accurint database constitutes a "consumer report" under the FCRA and that LexisNexis acted willfully in collecting and selling such reports, this Settlement relief would be objectively considered by most—if not all—as unachievable. Especially in view of the fact that the Federal Trade Commission—the agency actually charged with enforcing the FCRA—issued a 2008 letter in which it stated that Accurint was not a FCRA-covered "consumer report," this Settlement extends well beyond "fair, reasonable, and adequate," and the district court operated well within its discretion in approving it. *In re Jiffy Lube Sec. Litig.*, 927 F.2d 155, 159 (4th Cir. 1991.)

The district court also correctly certified the 23(b)(2) Class, because every Class member will receive precisely the same injunctive relief. FED. R. CIV. P. 23(b)(2); *Wal-Mart Stores, Inc. v. Dukes*, __ U.S. __, 131 S. Ct. 2541, 2557 (2011) (holding that Rule 23(b)(2) certification is appropriate "when a single injunction or declaratory judgment would provide relief to each member of the class"). The Rule 23(b)(2) Settlement appropriately resolves the Class' claims for statutory damages (which the district court found "speculative at best" in light of the FTC's letter opinion, (App'x 2882)) while preserving all claims for individual actual damages. Because statutory damage claims are not individualized but "flow directly from liability to the class *as a whole*," *Wal-Mart*, 131 S. Ct. at 2560 (emphasis added), they are incidental to the injunctive relief and may be released consistent with Rule

23(b)(2). *Ass'n for Disabled Americans, Inc. v. Amoco Oil Co.*, 211 F.R.D. 466 (S.D. Fla. 2002).

Moreover, contrary to Objectors' argument, the Settlement's release is explicitly limited to claims related to the Accurint database—the underlying factual predicate of this lawsuit—and most certainly does not grant an "unbridled waiver" of FCRA claims related to Accurint's Contact & Locate product. To the contrary, the Settlement forbids including any FCRA-covered information in Contact & Locate and gives Class members the corresponding right to sue for violation of the Injunctive Relief Order should LexisNexis violate this commitment.

Finally, the district court did not abuse its discretion in awarding $5.3 million in injunctive-relief attorneys' fees, representing less than a 1.88 multiplier on the time devoted over many years to secure injunctive relief that has been described as a "sea change" and an "earthquake in the market," and has been valued—by the nation's leading privacy expert—in the billions of dollars. Unquestionably, the fee award was within the district court's considerable discretion in light of the protracted nature of this high-risk, complex litigation as well as the district court's findings that counsel achieved an "excellent" result and provided "substantial benefits for over 200 million consumers." (App'x 2883.) This Court should therefore affirm the district court's order approving the Settlement.

## V.    ARGUMENT

**A.    Because the Settlement is an excellent result for the Classes, this Court should affirm the district court's finding that it is fair, reasonable, and adequate.**

The fairness analysis of a settlement ensures that "the settlement was reached as a result of good-faith bargaining at arm's length, without collusion." *In re Jiffy Lube Sec. Litig.*, 927 F.2d at 159. The factors courts consider include "(1) the posture of the case at the time settlement was proposed, (2) the extent of discovery that had been conducted, (3) the circumstances surrounding the negotiations, and (4) the experience of counsel in the area of class action litigation." *Id.* Here, the district court correctly found that all of these factors establish the Settlement as fair, reasonable, and adequate. (App'x 2881–82.)

The district court found "the fact that most clearly demonstrates the fairness, reasonableness, and adequacy of the Settlement Agreement is the relative strength of each Party's legal claim or defense." (*Id.* 2882.) The court noted Plaintiffs are required to prove a "willful" violation of FCRA in order to recover statutory damages. (*Id.*); *see* 15 U.S.C. § 1681n. The Supreme Court has held that defendants "cannot willfully violate the FCRA unless its requirements are 'clearly established.'" (App'x 2882 (quoting *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 70 (2007).) The district court further noted that, under *Safeco*, "[w]here the statutory text and relevant agency and court guidance allow for more than one reasonable interpretation, a defendant that acts consistently with one of those interpretations cannot be held liable as a willful violator." (*Id.* (citing *Safeco*, 551 U.S. at 70 n.20).) This precedent imposed substantial risk to Plaintiffs' statutory

– 16 –

damages claim, particularly in light of the FTC's 2008 letter characterizing Accurint's reports as non-FCRA-governed.

Far beyond "adequate," given this posture, it is remarkable that Plaintiffs were able to achieve the significant—if not unprecedented—relief provided by the Settlement. Class members will now have notice of any adverse action taken against them based on Collections Decisioning reports and an opportunity to obtain and correct mistakes in those reports. (App'x 2889; 15 U.S.C. §§ 1681g, 1681i, 1681m.) If LexisNexis fails to follow reasonable procedures to ensure the "maximum possible accuracy" of its Collections Decisioning reports, Class members can bring damages claims under FCRA. 15 U.S.C. § 1681e(b). Such claims can be substantial, commonly ranging into the tens of thousands and even millions of dollars. (*See* App'x 2760, 2848.) Finally, consumers will be able to access and comment on their Contact & Locate reports, rights that could never have been achieved absent this Settlement. (*Id.* 2891–92.) Finding that "the merit of Plaintiffs' claims—and necessarily, the absent Class members' theoretical future claims—is speculative at best," the district court concluded the Settlement's "substantial relief without the risk of litigation demonstrates the adequacy of the Settlement Agreement." (*Id.* 2882.)

Also relevant to the *Jiffy Lube* analysis, the court found the Parties had conducted "extensive discovery" in this and two prior lawsuits, showing that "the duration and expense of additional litigation in the absence of a settlement would be significant." (*Id.* 2881.) This Settlement is the result of "arm's-length negotiations by highly experienced counsel after full discovery was completed,"

independently confirming its reasonableness. (*Id.*) While Objectors have little or no FCRA experience, Class Counsel have more combined experience in both class and individual FCRA litigation than any other lawyers in the country, and they view this Settlement as an excellent result for the Class. (App'x 1691–96, 1699–1700, 2065–69, 2108–13.)

Objectors nowhere seriously address, much less refute as "clear error," the key facts found by the district court supporting the Settlement's adequacy. Most glaringly, they ignore the significant risk presented by *Safeco's* requirement that a FCRA violation must be "clearly established" for recovery of statutory damages. Despite the fact that the parties thoroughly refuted Objectors' misunderstanding of the *Adams* decision in their briefing and argument below (*see, e.g.*, App'x 2780–90), Objectors persist in arguing that *Adams* somehow lends support to Plaintiffs' willfulness claims. (Objectors' Br. at 39–40.) To the contrary, in *Adams*, Judge Bumb went so far as to say that, in the absence of contrary evidence, the FTC's letter (also noted by the district court here as a significant risk factor) would be dispositive for LexisNexis on the willfulness issue. (App'x 2370; *see supra* Section II.A.2.) This Court should therefore affirm the district court's finding that the Settlement is fair, reasonable, and adequate.

**B.    The District Court's certification of the 23(b)(2) class was proper.**

As the district court found, the injunctive relief provided in the Settlement "is indivisible and applicable to all members of the Rule 23(b)(2) class." (App'x 2877.) Because of this Settlement, all Class members will have the right to know when their personal information is used against them and, if necessary, correct it.

(*See supra* Section II.C.1.a.) The sweeping practice changes agreed to by LexisNexis will be implemented company-wide, benefiting all Class members. (*Id.*) This is precisely the kind of indivisible, classwide relief for which 23(b)(2) was intended. *See* FED. R. CIV. P. 23(b)(2); *Wal-Mart Stores, Inc. v. Dukes*, ___ U.S. ___, 131 S. Ct. 2541, 2557 (2011) (holding that 23(b)(2) certification is appropriate "when a single injunction or declaratory judgment would provide relief to each member of the class").

In addition, the Parties extended well beyond 23(b)(2)'s requirements, eliminating any potential due process concern regarding notice to the 23(b)(2) Class by implementing an extensive notice program, using national print and online media to reach an estimated 75% of Class members. (App'x 1960–66, 2248, 2861; *see supra* Section II.C.1.c.) Certification of the injunctive relief class under Rule 23(b)(2) was therefore proper and should be affirmed.

1.   *The Settlement appropriately releases 23(b)(2) Class members' claims for statutory damages, which are incidental to injunctive relief, while preserving individual actual damage claims.*

This Court should reject Objectors' challenge to the release of statutory damages on behalf of the 23(b)(2) Class. Despite the fact that FCRA statutory damages flow directly from a willful violation of the statute, Objectors argue statutory damages are a kind of "individualized" relief that cannot be released without giving Class members an opportunity to opt out and pursue individual claims. (Objectors' Br. at 19–22.) Objectors rely principally on *Wal-Mart*, 131 S. Ct. 2541. *Wal-Mart*, however, was not a statutory damages case; to the contrary, the Court's opinion in *Wal-Mart* expressly states that it *does not overrule* well-

established precedents holding that statutory damage claims may be resolved under 23(b)(2). *Wal-Mart*, 131 S. Ct. at 2560 (observing that the issue was not presented in *Wal-Mart*, as all parties agreed that the damages were individualized).

> ### a.   Unlike in *Wal-Mart*, Plaintiffs' statutory damages are not individualized.

In *Wal-Mart*, the plaintiffs "held a multitude of different jobs, at different levels of Wal-Mart's hierarchy, for variable lengths of time, in 3,400 stores, sprinkled across 50 states, with a kaleidoscope of supervisors (male and female), subject to a variety of regional policies that all differed . . . . " *Wal-Mart*, 131 S. Ct. at 2557 (quoting *Dukes*, 603 F.3d at 652 (Kozinski, J., dissenting)). They sought individualized awards of backpay, differing for each plaintiff according to the amounts various employees would have earned but for Wal-Mart's alleged sex discrimination. *Id.* at 2557–58. Observing that "individualized monetary claims belong in Rule 23(b)(3)," the Court found 23(b)(2) certification of the individual backpay claims was improper. *Id.* at 2558–59.

Here, by contrast, the only claims released by 23(b)(2) Class members are for statutory damages that "flow directly from liability to the class *as a whole* on the claims forming the basis of the injunctive or declaratory relief." *Wal-Mart*, 131 S. Ct. at 2560 (citing *Allison v. Citgo Petroleum Corp.*, 151 F.3d 402, 415 (5th Cir. 1998) (emphasis in original).) The *Wal-Mart* Court explicitly distinguished such cases, leaving undisturbed the long line of precedent holding that "[m]onetary relief may be obtained in a Rule 23(b)(2) class action so long as the predominant relief sought is injunctive or declaratory." *Murray v. Auslander*, 244 F.3d 807, 812

– 20 –

(11th Cir. 2001); *see also Allison*, 151 F.3d at 411 (holding that (b)(2) classes are not restricted to "classes seeking exclusively injunctive or declaratory relief" and collecting authorities from other circuits); *Ass'n for Disabled Americans*, 211 F.R.D. at 473 (certifying 23(b)(2) class where settlement released only claims for statutory damages and did not release actual damage claims).

Even Objectors admit *Wal-Mart* did not overrule these precedents. (Objectors' Br. at 26 (conceding that "the Supreme Court has not reached the ultimate issue").) They nevertheless argue that dicta "suggested" the *Wal-Mart* majority might favor extending the law further, eliminating any kind of monetary relief from 23(b)(2) class actions in the future. (*Id.*)[6] This Court should decline Objectors' invitation to stretch the law beyond the point demarcated by the Supreme Court in *Wal-Mart*. As Judge Posner cogently explained, *Wal-Mart* limited 23(b)(2) certification only for *individualized damage awards*, i.e., "awards based on evidence specific to particular class members." *Johnson v. Meriter Health Servs. Employee Ret. Plan*, 702 F.3d 364, 369 (7th Cir. 2012) (affirming certification of 23(b)(2) class where calculation of damages is "mechanical, formulaic, a task not for a trier of fact but for a computer program"). The Second Circuit has also held post-*Wal-Mart* that money damages may be awarded to

---

[6] Any such extension would directly contravene the Rules Advisory Committee's advice—long relied on by courts—that 23(b)(2) may apply to incidental monetary damage claims so long as the relief sought does not relate "exclusively or predominantly to money damages." Rule 23(b)(2) advisory committee note; *see Allison*, 151 F.3d at 411 ("This commentary implies that the drafters of Rule 23 believed that at least some form or amount of monetary relief would be permissible in a (b)(2) class action.")

– 21 –

23(b)(2) Class members where the monetary relief "does not depend on 'complex individualized determinations' for which litigation specific to each individual could make a difference." *Amara v. CIGNA Corp.*, 775 F.3d 510, 523–24 (2d Cir. 2014).

Here, the Settlement preserves all 23(b)(2) Class members' actual damage claims. (App'x 2878.) The only claims released are statutory-damage claims, for which the evidence is not specific to particular Class members, but rather exclusively focuses on LexisNexis' conduct. *See Kehoe v. Fidelity Fed. Bank & Trust*, 421 F.3d 1209, 1216 (11th Cir. 2005) (holding that a plaintiff need not prove actual damages to recover statutory damages). If Plaintiffs were to prevail at trial on their claims that Accurint is a "consumer report" and LexisNexis willfully violated FCRA, statutory damages would flow directly from this finding of liability to the class as a whole. 15 U.S.C. § 1681n(a); *see Safeco*, 551 U.S. at 57 (holding that plaintiffs may recover statutory damages upon proof of reckless violation of FCRA)*; Amara*, 775 F.3d at 523 (affirming certification of Rule 23(b)(2) class where "monetary benefits flow as a necessary consequence of that injunction").

The released claims here are plainly not individualized because the only issue relevant to 23(b)(2) Class members' statutory-damage claims—willfulness—is a classwide issue, as the district court correctly found. (App'x 2878 ("The 'qualitatively overarching issue[s]' in this case relate to Defendants' conduct, which was uniform with respect to each of the class members.")); *Thorn*, 445 F.3d at 317–18 (holding that district court does not abuse its discretion unless it "clearly

– 22 –

errs in its factual findings").[7] Ironically, Objectors acknowledged this reality below by including in their initial fee agreement with their clients an *automatic* authorization to settle every claim for $443, regardless of individual circumstances. (App'x 2739.) Nevertheless grasping for arguments that, despite the classwide nature of the willfulness issue, statutory damages might somehow be "individualized," objectors suggest statutory damages could vary according to whether a Class member's claim arose before or after the district court's denial of LexisNexis' motion for judgment on the pleadings in *Adams*. (Objectors' Br. at 24.) But as explained above, the *Adams* court actually stated that unless evidence emerged showing the FTC had changed its position regarding whether Accurint was a "consumer report," plaintiffs' willfulness claims would fail. (*See supra* Section II.A.2; App'x 2729.)

Because statutory damages here depend solely on the classwide issue of willfulness, Objectors' reliance on the unreported, and not precedential, *Soutter v. Equifax Information Servs., LLC*, 498 F. App'x. 260 (4th Cir. 2012), is misplaced. In *Soutter*, the plaintiffs alleged the defendant had failed to use adequate measures to ensure accurate information regarding consumer court judgments. *Soutter*, 498 F. App'x. at 263, 265. The evidence showed the defendant's contractor, LexisNexis, had used at least three different methods of collecting consumer judgments information during the class period. *Id.* In addition, the *Soutter*

---

[7] Because whether damages are individualized is a question of fact, abuse of discretion—and not, as Objectors wrongly contend, *de novo* review—is the proper standard. *See Amara*, 775 F.3d at 519.

plaintiff's willfulness claim depended in part on a letter that she individually had sent alerting the defendant to a possible inaccuracy in her credit report. *Id.* at 265. The *Soutter* majority thus found that whether the defendant's conduct was willful could vary among class members. *Id.* Here, in contrast, the same LexisNexis policies applied to the entire class. (App'x 2878.) If Accurint reports are clearly established to be consumer reports subject to FCRA, then every member of the class has a statutory damages claim; if they are not, no one does.[8] This is a textbook case of classwide statutory liquidated damages that, under well-established precedent unaltered by *Wal-Mart*, may be released under Rule 23(b)(2). *Ass'n for Disabled Americans*, 211 F.R.D. at 466; *see also Fresco v. Automotive Directions, Inc.*, No. 03-cv-61063, 2009 WL 9054828, at *3 (S.D. Fla. Jan. 20, 2009) ("Statutory damage claims may be incidental to injunctive relief and do not preclude certification under Rule 23(b)(2).")

---

[8] For the same reason, Objectors' citation to dicta in Judge Wilkinson's concurrence in the unpublished *Stillmock v. Weiss Markets, Inc.*, 385 F. App'x. 267 (4th Cir. 2010) is also off point. While Judge Wilkinson expressed his opinion that statutory damages under the Fair and Accurate Credit Transaction Act (FACTA) in that case might vary according to different harms suffered by different individual plaintiffs, here all 23(b)(2) class members suffered the same statutory harm. All had their personal information collected and made available for sale without any right to see the information or verify its accuracy. (*See supra* Section II.C.1.a.) The district court's finding that the issues bearing on statutory damages in this case are classwide was thus correct, and plainly within its discretion. (App'x 2878.)

**b. Precluding release of statutory damage claims under Rule 23(b)(2) would create a formidable barrier to dispute resolution.**

This Court should also decline to extend the law as Objectors suggest because the rule Objectors advocate would make many beneficial settlements, including this one, difficult or unachievable as a practical matter. Objectors argue that 23(b)(2) Class members must be afforded the right to opt out and/or preserve statutory damage claims while still benefiting from an injunctive relief settlement. (Objectors' Br. at 23, 26.) However, allowing 23(b)(2) Class members to have their cake and eat it too would expose defendants to duplicative liability. A defendant could incur millions of dollars in costs to implement injunctive relief, as LexisNexis has here, only to find itself still exposed to statutory damage claims. This concern is not merely hypothetical: the Aaron Objectors' counsel below, Watts Guerra, solicited thousands of statutory damage claims *en masse*, using a website marketing campaign, in an attempt to capitalize on this Settlement. By the time the district court ordered Watts Guerra to take down the website, they had induced over 20,000 people to sign up as "clients" based on misrepresentations about the Settlement. (*See* App'x 10.) Defendants reasonably expect a release from such unpredictable ongoing liabilities in exchange for settling claims.

**c. The scope of the release is reasonable and preserves all claims for individual actual damages.**

Contrary to Objectors' cynical insinuation, there is nothing sinister in Plaintiffs agreeing to a reasonable release—actually, quite a narrow one, because it preserves individual actual damage claims—in exchange for the valuable injunctive relief achieved in the Settlement. Professor Linda Mullenix, a nationally

recognized authority on federal procedure under Rule 23, explained in her declaration submitted in support of the Settlement that "[t]here is nothing illegal, collusive, or otherwise improper in securing a general release as part of a settlement agreement." (App'x 2248.) She further noted the Settlement's provision of $13.5 million to 23(b)(3) Class members and preservation of 23(b)(2) Class members' actual damage claims belie any suggestion that Class members here are "sacrificial pawns of the settling parties." (App'x 2247.) Observing that the release in this case "is identical to the release that the federal court approved in the *Disabled Americans* settlement class," as well as in the *Fresco* case, Professor Mullenix concluded that certification of the 23(b)(2) class was in conformity with the courts' long-standing tradition of using 23(b)(2) classes to protect Class members' rights, such as the consumer rights in personal and financial information protected by the Settlement in this case. (App'x 2248–49.) Despite Objectors having extensively—and mistakenly, as she chided them for (App'x 2246–47)[9]— relied on one of Professor Mullenix's articles in the trial court, Objectors say nothing in response to her detailed analysis. (Objectors' Br., *passim*.) Because the individualized actual damage issues that troubled the *Wal-Mart* Court simply do not arise here, the district court properly certified the 23(b)(2) class.

---

[9] Mullenix stated: "In citing my article, Schulman has misinterpreted my thesis, quoted me out-of-context, and plucked selective sentences to support his arguments, with which I do not agree." (App'x 2247.)

2.     *The parties had the power to agree to, and the district court to order, the Settlement's injunctive relief.*

This Court should also reject Objectors' argument that, because some defendants have prevailed on statutory defenses to injunctive relief in FCRA cases,[10] the parties could not settle this dispute by consenting to the practice changes contained in the Settlement. (*See* Objectors' Br. at 16–17.) Courts have long recognized that, in accordance with principles of freedom of contract and the policy of encouraging resolution of disputes,[11] parties have broad discretion to settle litigation by agreed injunctive relief, regardless of whether such relief might have been available in contested proceedings. *See Sullivan v. DB Invs.*, *Inc.*, 667 F.3d 273, 317 (3rd Cir. 2011) (holding that district court "could reasonably approve a mutually agreed-upon stipulation enjoining conduct within the Court's jurisdiction regardless of whether the plaintiffs could have received identical relief in a contested suit"). After all, "in the settlement context, 'it is the parties' agreement that serves as the source of the court's authority to enter any judgment

---

[10] This authority is not unanimous. *See Harris v. Equifax Info. Servs.*, No. 6:06-cv-01810, 2007 WL 1862826, at *3 (D.S.C. June 26, 2007) (denying motion for summary judgment on FCRA injunctive relief claims, holding that "[o]n the issue of the availability of injunctive relief, the Court concludes that although it is aware of contrary authority, none of it is binding on this Court, and that such authority is inconsistent with *Calfinao v. Yamasaki,* 442 U.S. 682, 705[ ] (1979)".) Moreover, as Professor Richards noted for the district court, while FCRA does not expressly provide for injunctive relief, neither does it expressly prohibit it. (App'x 579–80.)

[11] There is a strong and long-standing judicial policy within this Circuit favoring resolution of litigation before trial. *See S.C. Nat'l Bank v. Stone*, 749 F. Supp. 1419, 1423 (D.S.C. 1990) ("[T]he voluntary resolution of litigation through settlement is strongly favored by the courts") (citing *Williams v. First Nat'l Bank*, 216 U.S. 582 (1910)).

– 27 –

at all.'" *Local Number 93 v. City of Cleveland*, 478 U.S. 501, 522 (1986); (*see* App'x 2878.) Thus, the two cases Objectors attempt to rely on are irrelevant because both concerned contested motions, not an agreed settlement. *See Bolin v. Sears, Roebuck & Co.*, 231 F.3d 970, 977 n.39 (5th Cir. 2000) (appeal from contested grant of class certification); *Christ v. Beneficial Corp.*, 547 F.3d 1292, 1298 (11th Cir. 2008) (same). In the end, even Objectors appear to concede this point, admitting "[p]arties are certainly capable of entering into a settlement agreement that provides relief that would not be available under the statute." (Objectors' Br. at 23.)

According to well-established practice, consent decrees are not just available, but often the best, way of resolving FCRA class actions. Because credit reporting agencies', data aggregators', and employers' policies affect the privacy of personal and financial information for millions of consumers, consent decrees enforcing FCRA rights are an important public policy tool, not just in this case, but in consumer privacy litigation nationwide. Indeed, courts routinely approve orders mandating practice changes in FCRA settlements. *See, e.g.*, *James v. Experian Info. Solutions Inc.*, No. 3:12-cv-00902 (E.D. Va. Dec. 8, 2014) (Dkt. 156); *Ryals v. Hireright Solutions, Inc.*, No. 3:09-cv-00625 (E.D. Va. Dec. 21, 2011) (Dkts. 62-1, 123); *Conley v. First Tenn. Bank, N.A.*, No. 1:10-cv-01247 (E.D Va. Aug. 18, 2011) (Dkts. 28-1, 37); *Beverly v. Wal-Mart Stores, Inc.*, No. 3:07-cv-00469 (E.D. Va. May 1, 2009) (Dkt. 82); *Goode v. First Advantage LNS Screening Solutions, Inc.*, No. 2:11-cv-02950 (E.D. Pa. Dec. 29, 2014) (Dkts. 70, 77); *King v. Gen. Info. Servs., Inc.*, No. 2:10-cv-06850 (E.D. Pa. Nov. 4, 2014) (Dkt. 125); *Robinson v.*

– 28 –

*Gen. Info. Servs., Inc.*, No. 2:11-cv-07782 (E.D. Pa. Nov. 4, 2014) (Dkts. 44-2, 55); *Sapp v. Experian Info. Solutions, Inc.*, No. 2:10-cv-04312 (E.D. Pa. May 15, 2013) (Dkt. 40); *Chakejian v. Equifax Info. Servs., LLC*, 275 F.R.D. 201, 206–07 (E.D. Pa. 2011); *Serrano v. Sterling Testing Sys., Inc.*, 711 F. Supp. 2d 402, 409 (E.D. Pa. 2010); *Barel v. Bank of Am.*, 255 F.R.D. 393, 397 (E.D. Pa. 2009); *Roe v. Intellicorp Records, Inc.*, No. 1:12-cv-02288 (N.D. Ohio June 5, 2014) (Dkts. 121, 123, 139); *Black v. Winn-Dixie Stores, Inc.*, No. 3:09-cv-502 (M.D. Fla. June 17, 2011) (Dkt. 56); *White v. Experian Info. Solutions, Inc.*, No. 05-CV-1070-DOC (C.D. Cal. Aug. 19, 2008) (Dkt. 338).[12]

In the FCRA context, courts, litigants, and experts all recognize that injunctive relief is often *the most valuable* component of FCRA settlements. Judge Lauck called the injunctive relief here "a sea change and a good one and a thoughtfully conducted one." (App'x 1923.) Privacy expert Professor Richards also recognized that the injunctive relief "is where the genuine value in this settlement lies" and provides a "substantial benefit to consumers," which could not be achieved "were Plaintiffs to obtain a complete victory from their best day in court." (App'x 586–87.) Along these same lines, the district court described the injunctive relief as "a dynamic shift" in the industry "afford[ing] far better substantive rights than the Court or a jury could compel following a complete victory . . ." (App'x 2868.)

---

[12] Class Counsel, all of whom are highly experienced in FCRA litigation (App'x 1678, 1681, 1691–93, 2065–69, 2108–13), routinely pursue and obtain injunctive relief in their FCRA class settlements, including many of these cases. (*See, e.g*, App'x 1692–93, 2117–2118.)

– 29 –

It is immaterial that Plaintiffs did not specifically request injunctive relief—as opposed to statutory damages—in the prayer of their original Complaint. (*See* Objectors' Br. at 25.) First, injunctive relief is a remedy, not a claim, and the parties plainly have the ability to agree on, and the court to award, all appropriate remedies for the Class's properly pleaded claims. *See* FED. R. CIV. P. 54(c) (providing that, in every non-default judgment, courts "should grant the relief to which each party is entitled, even if the party has not demanded that relief in its pleadings"). Second, the record amply establishes that plaintiffs vigorously pursued LexisNexis to change its Accurint practices in the *Adams* and *Graham* litigation and continued to do so in this case. (*See supra* Section II.A.) Third, as acknowledged by Professor Richards (but apparently lost on Objectors), "the threat of statutory damages [in this case] has played its role to motivate a change in business in a consumer-proactive direction enforceable through injunctive relief." (App'x 584.)

Effective litigation often requires parties to make tactical choices about when, and in what context, to proffer issues for decision. This Court should not take that tactical discretion away by forever chaining plaintiffs to the relief demanded in their original complaints, and Rule 23 offers no support for doing so. To the contrary, 23(b)(2) explicitly states that it applies so long as "*final* injunctive relief . . . is appropriate respecting the class as a whole." FED. R. CIV. P. 23(b)(2) (emphasis added).

Neither does the case law Objectors cite support looking only to the Complaint, rather than to the final relief sought. In all of the cases cited by

Objectors, the courts were considering the relief then being requested by the Plaintiffs, not simply the relief originally requested in the Complaint. In two of those cases, the forms of relief were identical. *Lukenas v. Bryce's Mountain Resort*, 538 F.2d 594, 596 (4th Cir. 1976); *Richards v. Delta Air Lines*, 453 F.3d 525, 530 (D.C. Cir. 2006). In the third case, the court actually did consider the relief finally awarded in the settlement, not just that demanded in the original complaint, in determining whether monetary damages predominated over injunctive relief. *Hecht v. United Collection Bureau, Inc.*, 691 F.3d 218, 224 (2d Cir. 2012) (reviewing settlement and concluding that monetary relief predominated because, *inter alia*, "the damages remedy was the only remedy *awarded* that clearly applied to every class member") (emphasis added). Because consent decrees are within the parties' power to agree and widely used to protect consumer privacy rights, this Court should not squander one of the most effective and established tools available for protecting consumer privacy, but instead affirm the district court's order certifying the 23(b)(2) Class.

   3.   *The 23(b)(2) Class was adequately represented because all Class representatives and Class members had the same interest in securing the injunctive relief.*

The Court should also reject Objectors' argument that the district court erred in certifying the 23(b)(2) Class because the class representatives were not adequate. (Objectors' Br. at 31–36.) As an initial matter, Objectors' argument is based on a factual mistake: contrary to Objectors' representation that the district court appointed the same class representatives for both the 23(b)(3) class and the 23(b)(2) class, (Objectors' Br. at 34), the 23(b)(2) class actually did have two

– 31 –

separate class representatives who were not members of the 23(b)(3) Class—
Hernandez and Godfrey. (App'x 30, 32.) Neither Hernandez nor Godfrey could be
accused of any conflicting loyalties, and the Court should reject Objectors'
inadequate representation argument for that reason alone.

### a. The interests of 23(b)(3) and 23(b)(2) Class members are aligned.

In any case, there is no reason the 23(b)(2) and 23(b)(3) classes require
separate representation. Adequacy requires simply that the Plaintiffs "be part of the
same class and possess the same interest and suffer the same injury as the class
members." *Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 425 (4th Cir. 2003)
(quotes omitted). Here, the six Named Plaintiffs representing the 23(b)(2) class are
all members of the class they seek to represent and face the same risk of injury as
every other member of that class. (App'x 32–34.)

Courts routinely appoint the same class representatives and/or counsel to
represent different classes in the same settlement where, as here, the interests of the
different classes are aligned. *See, e.g.*, *Sykes v. Mel S. Harris & Assocs. LLC*, __
F.3d __, No. 13-2742-CV, 2015 WL 525904, at *6, *25 (2d Cir. Feb. 10, 2015)
(affirming district court's certification, over defendant's opposition, of classes
under 23(b)(2) and (b)(3) that did not require separate class representatives or
counsel for classes); *Milbourne v. JRK Residential Am., LLC*, No. 3:12-CV-861,
2014 WL 5529731, at *14 (E.D. Va. Oct. 31, 2014) (certifying two contested
FCRA classes with the same counsel and single representative for both classes);
*Singleton v. Domino's Pizza, LLC*, 976 F. Supp. 2d 665, 676–77, 691 (D. Md.

2013) (granting final approval to settlement of three FCRA classes with the same representatives and counsel for all classes).

Similarly here, all members of both classes share the same interest in correcting LexisNexis' business practices to protect their personal information. Contrary to Objectors' argument, (Objectors' Br. at 44–45), it is not just permissible, but an enormous benefit to the public to extend the injunctive relief to all whose personal information is contained in LexisNexis' database. *See Denney v. Deutsche Bank AG*, 443 F.3d 253, 269 (2d Cir. 2006) (finding no conflict between class members who had already been assessed a tax penalty and future-risk class members not yet penalized); (App'x 587).

The fact that 23(b)(3) Class members, who have stronger damage claims, will also receive some monetary compensation likewise creates no conflict. *See In re Pet Food Prods. Liab. Litig.*, 629 F.3d 333, 347 (3d Cir. 2010) (finding no conflict where settlement allocated a larger monetary percentage to class members with more valuable claims). Moreover, contrary to Objectors' argument that the Settlement traded away valuable monetary relief that could have otherwise been secured for the 23(b)(2) Class, the agreed injunctive relief was the best and most pragmatic result for the 23(b)(2) Class.[13] The 23(b)(2) Class is estimated to number approximately 200 million people—nearly every adult American. (App'x 2731.) It

---

[13] Indeed, it was a spectacular result in light of the risks their claims faced. In addition to the obstacles to recovery noted above—particularly the challenge of proving willfulness—because of the way LexisNexis maintained its business records, it is not apparent Objectors would have been able to secure admissible evidence that LexisNexis actually issued reports as to them. (App'x 2854.)

would simply be unrealistic, as a practical matter, to provide any significant sum of money to every 23(b)(2) Class member: even the minimum statutory damages would dwarf LexisNexis' enterprise value. (App'x 2731–32.) What benefits 23(b)(2) Class members more than a small sum of money—even $1.00 per Class member would require a $200 million common fund—is the assurance that: (1) their personal information cannot be used against them without notice; (2) they can bring legal claims for compensation if they are denied a job or mortgage as a result of LexisNexis failing to use reasonable procedures to ensure the maximum possible accuracy of its Collections Decisioning information; and (3) they can correct or comment on mistakes in the information that LexisNexis makes available about them. (*See* App'x 2733, 2751–52.) Indeed, the only objector to the 23(b)(3) settlement, JoAnn Nix, who stands to receive approximately $300 and did not realize the Settlement also provides for injunctive relief, wrote a letter specifically to complain that it was not money she wanted; instead, she wanted LexisNexis to fix the inaccuracies in her personal information, which were causing her to be harassed by debt collectors for money she did not owe. (*See* App'x 2709, 2315–17.) The injunctive relief gives her and every other 23(b)(2) Class member that right. (*Id.*)

Thus, this case is not like *Broussard v. Meineke Discount Muffler Shops, Inc.*, 155 F.3d 331 (4th Cir. 1998), on which Objectors rely. In *Broussard*, the Court found a conflict because the interests of the three groups comprising the class were not aligned: the first wanted a large damage award; a contingent of the second wanted all damages returned to the advertising pool at the source of the

– 34 –

controversy; and the third (of which plaintiffs were a part) would benefit from a large damage award but was also dependent on the defendant's longevity. *Id.* at 338. Similarly, in *In re Literary Works in Electronic Databases Copyright Litigation*, 654 F.3d 242 (2d Cir. 2011), the class representatives had an incentive to maximize the recovery of holders of registered copyright claims at the expense of unregistered copyright holders, who were not separately represented. *Id.* at 251–52.

Unlike *Broussard* and *In re Literary Works*, all 23(b)(2) Class Members here were affected by the same LexisNexis policies and have an interest in securing the same injunctive relief. (Also, as noted above, the 23(b)(2) Class *did* have separate class representatives.)[14] There is thus no conflict, and certainly not one so fundamental that it goes "to the heart of the litigation," as required to render class representatives inadequate. *Gunnells*, 348 F.3d at 430–31. The district court therefore did not abuse its discretion in appointing Plaintiffs to represent the 23(b)(2) Class.

### b. The service awards and attorneys' fees awarded were appropriate and created no conflict between Class representatives or counsel and the Class.

Nor is there any merit to Objectors' contention that the modest $5,000 service awards or attorneys' fees created a conflict. (App'x 2883; *see* Objectors' Br. at 34.) Service awards are commonplace in class actions—particularly where, as here, the class representatives undertook significant responsibilities and

---

[14] *See supra* Section V.B.3.

expenditures of time on the class' behalf. (App'x 2143–45, 2148–50, 2153–55, 2158–60, 2163–65, 2168–70); *see Domonoske v. Bank of Am., N.A.*, 790 F. Supp. 2d 466, 477 (W.D. Va. 2011); *Cook v. Niedert*, 142 F.3d 1004, 1016 (7th Cir. 1998). Guarding against any possibility of service awards or attorneys' fees creating a conflict, the parties deferred negotiation of the service awards and fees "until after the substantive terms of the settlement had been negotiated and agreed upon during the mediation." (App'x 1754; *see id.* 2013.) There could therefore be no possibility of trading the amount of the service awards or attorneys' fees for a lower level of relief for Class members.

The Settlement here bears no resemblance to the settlement in *In re Dry Max Pampers Litigation*, 724 F.3d 713 (6th Cir. 2013). In *Pampers*, the defendant agreed merely to add a one-sentence warning label on its diaper boxes alerting parents to the possible risk of diaper rash, which the Seventh Circuit found "nearly worthless injunctive relief." *Id.* at 715, 718–19. The named plaintiffs, in contrast, sought to receive $1,000 per "affected child;" and class counsel, $2.73 million in attorneys' fees. *Id.* at 717–18. Thus, the service awards and attorneys fees in *Pampers* were dramatically out of proportion to any service rendered for the class. *Id.*[15]

---

[15] *Holmes v. Continental Can Co.*, 706 F.2d 1144, 1147 (11th Cir. 1983), likewise does not support disturbing the district court's decision. In that case, the conflict arose when class representatives, permitted to divide a $43,000 settlement fund among the class, took approximately half for themselves. *Id.* at 1146. Here, in contrast, the modest service awards reasonably compensate the Class representatives for the time they spent to secure valuable relief on behalf of the Classes.

Unlike the minor labeling change in *Pampers*, the injunctive relief here will cost LexisNexis millions to implement and provides concrete rights that have been valued in the hundreds of millions to billions of dollars.[16] (App'x 587.) Not only do millions of consumers obtain full FCRA protections and FCRA-like rights where none whatsoever existed, they also retain their right to sue for actual damages against LexisNexis. What is more, without the notice provided through national media and internet advertising, many 23(b)(2) Class members would never have realized LexisNexis was reporting information about them, and thus could not have learned of any actual damage claims they might possess. (App'x 2726–27.) This excellent result not only distinguishes *Pampers*; it independently confirms that Rule 23(a)(4)'s adequacy requirement was met. *DeBoer v. Mellon Mortg. Co.*, 64 F.3d 1171, 1175 (8th Cir. 1995) (explaining that the settlement result determines adequacy).

**C.    The Contact & Locate product provides valuable relief to the Class and creates an obligation via court order that confers on the Class a future right to sue should LexisNexis alter the product to violate FCRA.**

Having failed to raise this argument in their briefing below,[17] Objectors now devote a single page to arguing the Settlement's provisions regarding Contact &

---

[16] Nor does the fact that payment of service awards and fees is contingent upon final approval of both settlements warrant reversal of the district court's decision. (Objectors' Br. at 35.) It is entirely commonplace and reasonable for a defendant to expect a complete release in a case that, like this one, contains a hybrid of 23(b)(3) and (b)(2) relief. (*See* App'x 2248.)

[17] Schulman made this argument for the first time in a brief aside at the final approval hearing. (App'x 2837–38.)

Locate somehow constitute an "unbridled waiver of future conduct." (Objectors' Br. at 45–46.) They are joined by Amicus James Grimmelman who, while apparently well-meaning, fundamentally misunderstands the relief provided in the Settlement and the scope of the release.[18] He similarly calls the Settlement's Contact & Locate provisions an "open-ended prospective release." (Amicus Br. at 6.) The record shows the contrary: the parameters of Contact & Locate are well defined, and LexisNexis will be in violation of the Settlement and the Court's Injunctive Relief Order if it includes FCRA-covered "seven-characteristic" information in Contact & Locate. (App'x 121, 584–87, 2890.) Undercutting Objectors' and Amicus' arguments, Contact & Locate **does** currently exist. What is more, it is providing consumers important, enforceable rights that they could *never* obtain absent this Settlement. The Court should therefore reject Objectors' future-conduct argument.

> 1. *The Settlement Agreement and the district court's Injunctive Relief Order forbid including FCRA-covered information in Contact & Locate.*

Plaintiffs engaged in hotly contested negotiations regarding exactly what information could and could not be included in Contact & Locate. (App'x 1696–97, 1878–99.) As a result, the Settlement sets well-defined boundaries on the

---

[18] Grimmelman shares Schulman's complete lack of FCRA expertise. A law professor at the University of Maryland, his focus is intellectual property—not civil procedure or class actions like Professor Mullenix—and he describes himself as follows: "I study how laws regulating software affect freedom, wealth, and power. I try to help lawyers and technologists understand each other." (*See* James.Grimmelman.net.)

information that LexisNexis can sell to credentialed customers for debt collection using the Contact & Locate product. (App'x 121.) It **requires** LexisNexis to exclude FCRA-covered "seven characteristic" information. (*Id.*); *see* 15 U.S.C. § 1681a(d)(1) (defining information bearing on these seven characteristics as a "consumer report" subject to FCRA).) Should any information be included that arguably bears on an eligibility determination, it must be only information "the use of which bears a reasonable relationship to the location of a debtor or to the location of assets securing the debt for purpose of repossession." (App'x 121–22.) The Settlement thus ensures that Contact & Locate will not include information subject to FCRA. *See Fuges v. Sw. Fin. Servs. Ltd.*, 707 F.3d 241, 252–54 (3d Cir. 2012) (holding it is reasonable to interpret "consumer report" as not including property searches).[19]

Detailed information regarding the content of Contact & Locate was exchanged during settlement negotiations and considered by the district court at final approval (and made available to the Objectors). (App'x 1878–99; Supp. App'x 3053–75.) The Parties prepared and presented to the district court exemplary screenshots showing exactly what Contact & Locate users would see.

---

[19] Objectors and their Amicus attempt to seize on the fact that the Settlement Agreement allows LexisNexis limited discretion to make adjustments to Contact & Locate "to respond to the then current requirements of customers and the market." (App'x 122; *see* Amicus Br. at 6.) As explained to Judge Lauck, however, this limited flexibility is reasonable because LexisNexis operates in an evolving industry. (App'x 1830–31.) Of course, if LexisNexis includes seven-characteristic information in Contact & Locate, class members will have a right to sue for breach of the Settlement and the Injunctive Relief Order. (*See infra* Section V.C.3.)

(Supp. App'x 3061–75.) As agreed and shown in these screenshots, Contact & Locate includes only a person's name, address, telephone number, social security number, and other information that courts have found is *not* FCRA-covered "seven-characteristic" information. (*Id.* 3063–64); *see Fuges*, 707 F.3d 247–48; *see also* FTC, *40 Years of Experience with the Fair Credit Reporting Act: An FTC Staff Report with Summary of Interpretations* at 20 (July 2011) (explaining that " a 'skip tracer' report of prior addresses used solely to locate an uninsured automobile driver" is not a "consumer report" subject to FCRA).

Objectors and Amicus are also simply wrong in claiming that Contact & Locate does not yet exist. (Objectors' Br. at 46; Amicus Br. 6, 11–17.)[20] Contact & Locate is a subset of the Accurint database that is the subject of this litigation, and has already been separated and made available to customers, in accordance with the Settlement. The district court's Injunctive Relief Order required LexisNexis by December 31, 2013: (a) to release the initial versions of Collections Decisioning and Contact & Locate; (b) to market the new products to all new customers; (c) to "migrate" existing customers to the new products; and (d) to implement the Consumer Access Program, providing consumers free access to their Contact & Locate reports. (App'x 2894–95.) Since the final approval hearing, LexisNexis has implemented Contact & Locate and has begun migrating customers.[21] Indeed, a

---

[20] Because of this fundamental factual mistake, all of Amicus's arguments regarding ripeness, Article III's Case or Controversy requirement, and statutory jurisdiction are based on a false premise and should be disregarded. (*See* Amicus Br. at 11–17.)

[21] Neither Objectors nor any other person has claimed that LexisNexis has not met

quick Internet search reveals that the Injunctive Relief Order requirements have been met, further confirming the details of the Contact & Locate product reviewed by the district court.[22]

> 2.    *Nowhere in the Settlement Agreement does the Class release its right to sue LexisNexis over the Contact & Locate product.*

Also contrary to the Objectors' argument, the Settlement's release says nothing regarding waiving all liability for future conduct regarding Contact & Locate. Instead, the release is explicitly limited to claims resulting from, arising out of, or in any way connected to the "Covered Conduct"—i.e., the alleged FCRA violations regarding the Accurint database that are the subject of this lawsuit. (App'x 1716.) The release thus explicitly parallels the factual predicate of the lawsuit, belying Objectors' argument to the contrary. (Objectors' Br. at 46; *see also* Amicus Br. at 18–22.) Claims regarding Contact & Locate are released only to the extent that, because Contact & Locate is a subset of the Accurint database, such claims are related to the factual predicate of this lawsuit.[23] *See In re Literary Works*, 654 F.3d at 248.

---

these deadlines, as confirmed by a simple check of the district court's docket.

[22] *See* LexisNexis Accurint for Collections: Contact & Locate Workflow, *available at*   http://www.lexisnexis.com/risk/downloads/literature/accurint-for-collections-contact-and-locate-workflow-ss.pdf.

[23] As even Grimmelman admits, injunctive relief dividing Accurint into two products is a reasonable resolution to Plaintiffs' claims (Amicus Br. at 5 ("In short, splitting Accurint into Collections Decisioning and Contact & Locate could potentially have been a component of a reasonable settlement of the parties' dispute.")

3.    *The Settlement creates a future right to sue should the Contact & Locate product ever include "seven-characteristic" data.*

Far from releasing LexisNexis from future liabilities, the Settlement's provision prohibiting LexisNexis from including "seven-characteristic" information in Contact & Locate means if LexisNexis collects and sells consumer-report information in this database, it can be sued to enforce the Settlement and the district court's Injunctive Relief Order. (App'x 121, 2890.) As is customary in class action settlements, the district court expressly reserved continuing jurisdiction to enforce its Order. (*Id.* 2870, 2897.)

Nor will Plaintiffs or their Counsel—who have pursued this litigation over the course of many years—turn a blind eye to any future wrongdoing. Contact & Locate is a publicly available product whose reports, thanks to the Settlement, consumers can now obtain free of charge. If LexisNexis adds seven-characteristic information to the Contact & Locate database, Class Counsel will be readily available and willing to represent clients in enforcing the Settlement and Injunctive Relief Order.

4.    *The Settlement Agreement assures Class members that they may sue third-party users who use Contact & Locate Data for FCRA-governed purposes.*

In addition, LexisNexis is obligated under the Settlement to credential its customers and obtain certifications that Contact & Locate information will not be used for FCRA-governed purposes. (App'x 121–22, 2891.) If any LexisNexis customers obtain credentials under false pretenses and/or falsely certify their purposes and use Contact & Locate information to determine eligibility for credit,

employment, insurance, or other FCRA purposes, those third parties will also be subject to suit. 15 U.S.C. § 1681q; (*see also* App'x 1884–85.)

> 5.    *The Settlement's provisions regarding Contact & Locate give Class members* **more** *rights in the future, not fewer.*

Objectors get the Settlement's provisions regarding Contact & Locate completely backward. Rather than immunizing LexisNexis from future liabilities, Contact & Locate gives consumers rights they could never have obtained without this Settlement. Despite that Contact & Locate is a simple "skip trace" report of the kind held not to be a "consumer report," consumers will be able to access a free copy of their Contact & Locate report—a right generally restricted to FCRA-governed reports—and submit a 100 word statement regarding any inaccuracies. (App'x 2892.) These are meaningful rights designed to combat real problems. (*See* App'x 2709–2712.) Because the Settlement thus provides Class members valuable rights regarding Contact & Locate and does not waive claims beyond the lawsuit's factual predicate, the Court should not credit Objectors' future-conduct argument.

**D.    The district court acted well within its discretion in awarding the injunctive relief fee.**

Schulman—the lone objector to the injunctive relief fee[24]—ignores the considerable evidence in the record from Class Counsel and experts alike regarding the work performed in this lawsuit and the extraordinarily high dollar value of the injunctive relief achieved. Improperly relying on authorities from outside the class

---

[24] Notably, the Aaron and Hardway objectors expressly declined to join in Schulman's effort to overturn the fee award. (Objectors' Brief at 46, n.1.)

action context, he attempts to impose new and unnecessarily burdensome requirements on district courts reviewing objections to Rule 23 settlements and constrain their discretion on fee matters, contrary to the long-standing rule in this Circuit. Because the district court's findings, amply supported by the record, justify the injunctive relief fee awarded, this Court should disregard Schulman's objection. *See Plyler v. Evatt*, 902 F.2d 273, 278 (4th Cir. 1990) (affirming class action fee award on clear error standard of review where the record below contained affidavits showing the hourly rates, experience, and skills of counsel involved).

### 1.    The Proper Standard of Review: Abuse of Discretion

This Court has long held that abuse of discretion—not, as Schulman urges, *de novo* review—is the proper standard of review for attorneys' fee awards.[25] "On appeal, 'this court has a ***duty*** to affirm an [attorney's fee] award which falls within the district court's broad discretion.'" *Carroll v. Wolpoff & Abramson*, 53 F.3d 626, 628 (4th Cir. 1995) (emphasis added, second alteration in original). In the class action context, the district court's discretion is tempered only by the requirement that the award be "reasonable." FED. R. CIV. P. 23(h); *see Boyd v. Coventry Health Care Inc.*, 299 F.R.D. 451, 461 (D. Md. 2014) (applying *Carroll* in discussion of attorneys' fees in Rule 23 context). In light of district courts'

---

[25] Schulman's suggestion that *Frahm v. United States* supports application of a *de novo* standard of review here is incorrect because the *de novo* aspect of the review in *Frahm* dealt exclusively with the legal determination of whether one was a prevailing party under 42 U.S.C. § 2000e-5(k) and 42 U.S.C. § 1988. *Frahm*, 492 F.3d 258, 263 (4th Cir. 2007). No such determination is at issue here.

unique familiarity with the services rendered in a case, this Court has held that "*the fee award must not be overturned unless it is **clearly wrong***." *Plyler*, 902 F.2d at 277–78 (emphasis added); *see also Jones v. Southpeak Interactive Corp of Del.*, __ F.3d __, No. 13–2399, 2015 WL 309626, at *14 (4th Cir. Jan. 26, 2015) (same).

> 2.    *The injunctive relief fee award is amply supported by the time spent and result achieved.*

Courts apply one of two methods for awarding fees in class actions—the percentage-of-the-fund approach and the lodestar approach. *Kay Co. v. Equitable Prod. Co.*, 749 F. Supp. 2d 455, 461–62 (S.D. W.Va. 2010). Under the lodestar approach—applicable here—courts multiply counsel's hours expended by a reasonable hourly rate. *Kay*, 749 F. Supp. 2d at 462. "The court may then adjust the lodestar figure using a 'multiplier' based on a number of factors, including the extraordinary benefit achieved for the class." *Id.* Here, the district court properly applied the lodestar method in awarding the injunctive relief fee. (App'x 2883, 2886.)

> a.    **Evidence of the time and labor expended supports the lodestar fee award.**

The district court made definitive factual findings in its Order, including that counsel "expended large amounts of time and labor." (App'x 2883.) Those findings were based on substantial evidence submitted by Class Counsel regarding their hourly rates and the work performed, as well as on expert testimony. Lawyers for each firm submitted detailed declarations setting forth the volume and difficulty of work undertaken in litigating against LexisNexis over Accurint reports and the rates of attorneys and staff. (*Id.* 1676, 2065, 2108, 2122.) Class Counsel explained,

in great detail, the work that went into achieving the injunctive relief settlement over the course of this litigation. (App'x 1694–1700, 2070–72, 2113–18, 2138–41.) Class Counsel also provided the district court with copious, detailed information relating to their skill, experience, and achievements to justify the billing rates sought. (*Id.* 601–10, 1676–1705, 2065–75, 2077–94, 2108–19, 2122–41.) Class Counsel also provided multiple citations to cases in which other courts have approved their rates, without reduction, in class action settlements across the country. (App'x 1701–04, 2073–74, 2118–19, 2136–37.)

Contrary to Schulman's contention that Judge Spencer relied solely on counsel's affidavits, (Objectors' Br. at 49), the record contains substantive declarations from experts Abraham Reich and Professor Geoffrey Miller,[26] which confirmed the reasonableness of Class Counsel's hourly rates and the time spent. (App'x 2097–2106, 2005–30.) Professor Miller considered numerous documents, noting they "indicate that Class Counsel fought to achieve the maximum possible value for the class," (*Id.* 2011), that, "[t]his was a major piece of litigation" lasting several years, (App'x 2015), and he thus saw no "yellow flags" regarding counsel's attestations to the time incurred. (*Id.*) Miller further opined that the reasonableness of the fee request was supported by, among other things, the

---

[26] Professor Miller, the Stuyvesant P. Comfort Professor of Law at New York University Law School, is a nationally recognized expert on class actions and attorneys' fees. So much so that courts across the country have extensively cited his work on class action fees. (*See* App'x 2008–09 (collecting the more than 50 cases in which federal courts have cited his statistical studies on class action attorneys' fees).)

"extended and complex history" of the case, which would have caused most lawyers to retreat given the two prior unsuccessful cases. (App'x 2012.) He lauded the settlement as "the result of vigorous and adversarial negotiation," noting multiple meetings were required to achieve the settlement. (*Id.*)

Professor Miller also opined on the reasonableness of Class Counsel's hourly rates, comparing them to those charged in bankruptcy litigation, (App'x 2017–19), as well as to rates awarded in similar class action cases. (App'x 2020–21.) Based on his review of these materials and Class Counsel's experience, skill, and the results achieved, Professor Miller concluded that Class Counsel's rates are indeed "appropriate and reasonable." (App'x 2017–21.) Furthermore, he concluded that 80% of counsel's time was appropriately allocated to achieving the injunctive relief, in view of "(1) the magnitude of the relief obtained, which he characterized as a "sea change" in LexisNexis' business practices that "is of much greater importance to class members in the aggregate"; (2) the fact that the demand for injunctive relief was "significantly more complicated to design and negotiate than damages relief"; and (3) that injunctive relief was the "center of gravity" of this litigation, as indicated by documents reviewed and Class Counsel's detailed settlement presentation to Magistrate Judge Lauck. (App'x 2015–16.) The district court clearly acted within its discretion in relying on this evidence to find the submitted hours and fees were reasonable. *Plyler*, 902 F.2d at 277–78.

b.    **No authority supports the exacting requirement Schulman attempts to impose on district courts to audit billing records in hour-by-hour detail.**

Schulman would have this Court require district courts to perform a detailed audit, scrutinizing thousands of entries in billing records whenever the lodestar method is used. (Objectors' Br. at 49.) Putting aside that Schulman cites no Fourth Circuit authority requiring review of hour-by-hour billing records,[27] mandating such a review would be contrary to the Supreme Court's opinion in *Fox v. Vice*, where it held that district courts should not convert themselves into auditors when considering fee awards, but may instead make "rough" calculations based on estimates, and that appellate courts should "give substantial deference to these determinations." *Fox v. Vice*, __ U.S. __, 131 S. Ct. 2205, 2216 (2011) (citations omitted). This holding of course dovetails with this Court's well-established tradition of respecting district courts' discretion on fees. *Plyler*, 902 F.2d at 277–78.

---

[27] *Newport News Shipbuilding & Dry Dock Co. v. Holiday*, 591 F.3d 219 (4th Cir. 2009), is inapposite because it did not hold that actual hour-by-hour billing records are necessary, but only that the party seeking fees has the burden to submit evidence in support of the award, as Class Counsel did here. Neither does the out-of-circuit authority Schulman cites help him. *Redman v. RadioShack Corp.*, 768 F.3d 622 (7th Cir. 2014), does not require submission of detailed hourly billing records, but was concerned with the fact that counsel submitted their motion for fees after the deadline to object had expired, violating Rule 23(h) and depriving potential objectors of any information about the fee request. Here, it is undisputed that Class Counsel submitted their fee motion in advance of the objection deadline.

### c.   The injunctive relief fee is reasonable in light of Class Counsel's skill and the results obtained.

In evaluating the reasonableness of attorneys' fees, courts also consider the novelty of the issues, the skill required to perform the services, the experience and reputation of counsel, the results obtained, and awards in similar cases. *Robinson v. Equifax Info. Servs., LLC*, 560 F.3d 235, 243–44 (4th Cir. 2009). Contrary to Schulman's argument, the district court's decision need not contain detailed discussion of "every single one of these factors." *Dollar Tree Stores, Inc. v. Norcor Bollingbrook Assoc., LLC*, 699 F. Supp.2d 766, 768 (E.D. Va. 2009). The Supreme Court has noted generally that "the most critical factor in determining the reasonableness of a[n] [attorney] fee award is the degree of success obtained." *Farrar v. Hobby*, 506 U.S. 103, 114 (1992) (internal quotation marks omitted).

Here, the outstanding injunctive relief achieved for the class easily justifies the injunctive relief fee award. In briefing below—before he realized that Plaintiffs had submitted expert testimony showing the value of the injunctive relief stretched into the hundreds of millions, if not billions, of dollars, (App'x 587)—Schulman actually admitted that if the injunctive relief were worth as little as $16.5 million, the injunctive relief fee award would be justified. (App'x 694.)

As Plaintiffs subsequently pointed out, the injunctive relief far exceeds that value. Professor Richards estimated the value of the injunctive relief to "be in the billions of dollars," and stated that "it is clear that the economic value of the Proposed Settlement to consumers is substantial beyond question." (App'x 587–88.) In a subsequent declaration, after responding directly to Schulman's incorrect claim that no one had attempted to place a dollar value on the injunctive relief,

– 49 –

Professor Richards confirmed his conclusion that the settlement "provides a substantial benefit to consumers that is different in degree and in kind from the minimal rights that consumers had before the filing of this litigation." (App'x 2299.)

Schulman nevertheless shifted gears and continues to argue that the injunctive relief is worthless. (Objectors' Br. at 49–50.) With no evidence or expert testimony to support his position, Schulman—who declined to review the details of the injunctive relief provided to the Court under seal—instead relies on a false analogy to cases involving no more than minor product labeling changes, a far cry from the massive reworking of LexisNexis' business achieved here. (*See supra* Section II.C.1.a.) In view of the excellent result achieved, which will protect the privacy rights of millions of Americans who apply for credit cards, insurance, or home mortgages, the district court found that the requested fee was reasonable. (App'x 2883.)

> ### d.    The awarded multiplier is reasonable in light of the excellent results achieved.

Class Counsel also provided the district court with ample evidence supporting the requested lodestar multiplier, which was 1.99 when the fee motion was filed, (App'x 2022), had already decreased to 1.88 by the final approval hearing, (App'x 2699–2700), and has continued to steadily decrease with the significant work required to respond to this appeal. The district court specifically considered the protracted nature of this "large and complex action" and that Class Counsel "achieved an excellent result" and "negotiated a Settlement Agreement

that provides substantial benefits for over 200 million consumers" in awarding the fee and multiplier. (App'x 2883.)

Schulman takes issue with the award of any multiplier, contending that *Perdue v. Kenny A.*, 559 U.S. 542 (2010), has all but eliminated multipliers in lodestar-based fee awards. (Objectors' Br. at 50–51.) Setting aside the fact that *Perdue* is, like most of Schulman's authorities, a case analyzing fees paid pursuant to a fee-shifting statute against resistance by the party involuntarily paying the fee,[28] *Perdue* actually recognized that a lodestar may be enhanced where, as here, litigation is protracted and the attorneys' superior performance achieved exceptional results. *Perdue*, 559 U.S. at 553–54. ("We reject any contention that a fee determined by the lodestar method may not be enhanced in any situation. The lodestar method was never intended to be conclusive in all circumstances.") Accordingly, numerous courts have awarded appropriate multipliers since *Purdue. See, e.g., Moore v. Verizon Commc'ns Inc.*, No. C 09-1823 SBA, 2014 WL 588035, at *7 (N.D. Cal. Feb. 14, 2014); *Morey v. Louis Vuitton N. Am., Inc.*, No. 11CV1517 WQH BLM, 2014 WL 109194, at *10 (S.D. Cal. Jan. 9, 2014); *In re Sw. Airlines Voucher Litig.*, No. 11 C 8176, 2013 WL 5497275, at *12 (N.D. Ill. Oct. 3, 2013); *see also Geneva Rock Prods., Inc. v. United States*, ___ Fed. Cl. ___, No. 08-9202, 2015 WL 358925, at *12 (Fed. Cl. Jan. 27, 2015); *City of*

---

[28] *Perdue* also has the distinguishing feature that the fees would be paid not by a private-entity defendant like LexisNexis, but by government defendants, meaning that any fees would be paid from taxpayer funds. *Perdue*, 559 U.S. at 547.

– 51 –

*Plantation Police Officers' Employees' Ret. Sys. v. Jeffries*, No. 2:14-CV-1380, 2014 WL 7404000, at *19 (S.D. Ohio Dec. 30, 2014).

Similarly here, the excellent results achieved justified the awarded multiplier. Professor Miller opined that a multiplier of 2 or more—greater than that actually awarded by the district court—was appropriate in light of counsel's exceptional success. (App'x 2022.) Professor Miller noted the importance of multipliers in litigation like this, stating that, in their absence, counsel would not have sufficient incentive to pursue risky litigation to vindicate consumer rights. (*Id*.) He also noted that the Settlement resulted in "comprehensive injunctive reforms which will provide benefits in the future for a far larger group." (App'x 2015.) He then provided a survey of cases, including cases post-dating *Perdue,* in which courts approved lodestar multipliers greater than the one awarded here. (App'x 2022–24.) Explaining why a multiplier was appropriate, Professor Miller detailed: (1) the risks, including those relating to establishing FCRA coverage for Accurint reports and the ability to certify the classes; (2) the substantial time and labor invested in litigating these cases; (3) the case's size and complexity; (4) Class Counsel's "skill, sophistication, and tenacity" over many years in reaching the settlement; (5) that the benefits to the Class from the injunctive relief far outweigh the requested fee; and (6) the public-policy benefits for millions of consumers from the injunctive relief. (App'x 2015–16, 2025–26.)

Taking note of the protracted nature of this litigation and the results achieved, the district court specifically based its decision to award a multiplier on its findings that Class Counsel achieved an "excellent result in this large and

complex action" and provided "substantial benefits for over 200 million consumers." (App'x 2883.) In so finding, the district court plainly acted within its discretion, and the evidence in the record fully justifies the district court's conclusion. *Plyler*, 902 F.2d at 277–78. This Court should therefore affirm the district court's injunctive relief fee award.

## VI.    CONCLUSION

For the reasons stated above, this Court should affirm the order of the district court.

Dated: February 25, 2015                Respectfully submitted,

                                        */s/ Michael A. Caddell*
                                        Michael A. Caddell
                                        Cynthia B. Chapman
                                        CADDELL & CHAPMAN
                                        1331 Lamar, Suite 1070
                                        Houston TX 77010
                                        Telephone: 713.751.0400
                                        Facsimile: 713.751.0906

                                        William W. Wilkins
                                        Kirsten E. Small
                                        Andrew A. Mathias
                                        NEXSEN PRUET
                                        55 E. Camperdown Way, Suite 400
                                        Greenville SC 29601
                                        Telephone: 864.282.1199
                                        Facsimile: 864.477.2699

                                        Leonard A. Bennett
                                        Matthew J. Erausquin
                                        CONSUMER LITIGATION ASSOCIATES, P.C.
                                        763 J. Clyde Morris Blvd., Suite 1A
                                        Newport News VA 23601
                                        Telephone: 757.930.3660
                                        Facsimile: 757.930.3662

– 53 –

James A. Francis
David Searles
John Soumilas
**FRANCIS & MAILMAN P.C.**
Land Title Building
100 S. Broad St., 19th Floor
Philadelphia PA 19110
Telephone: 215.735.8600
Facsimile: 215.940.8000

Dale W. Pittman
**THE LAW OFFICE OF DALE W. PITTMAN, P.C.**
112-A W. Tabb St.
Petersburg VA 23803-3212
Telephone: 804.861.6000
Facsimile: 804.861.3368

*Counsel for Plaintiffs / Appellees*

## CERTIFICATE OF SERVICE

I hereby certify that on February 25, 2015, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit using the appellate CM/ECF system.

I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

*/s/ Andrew A. Mathias*
Andrew A. Mathias

## UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

No. _____      Caption: _____

### CERTIFICATE OF COMPLIANCE WITH RULE 28.1(e) or 32(a)
Type-Volume Limitation, Typeface Requirements, and Type Style Requirements

1. **Type-Volume Limitation:** Appellant's Opening Brief, Appellee's Response Brief, and Appellant's Response/Reply Brief may not exceed 14,000 words or 1,300 lines. Appellee's Opening/Response Brief may not exceed 16,500 words or 1,500 lines. Any Reply or Amicus Brief may not exceed 7,000 words or 650 lines. Counsel may rely on the word or line count of the word processing program used to prepare the document. The word-processing program must be set to include footnotes in the count. Line count is used only with monospaced type.

This brief complies with the   type-volume limitation of Fed. R. App. P. 28.1(e)(2) or 32(a)(7)(B) because:

   [ ]      this brief contains _____ [*state number of*] words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

   [ ]      this brief uses a monospaced typeface and contains _____ [*state number of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. **Typeface and Type Style Requirements:** A proportionally spaced typeface (such as Times New Roman) must include serifs and must be 14-point or larger.  A monospaced typeface (such as Courier New) must be 12-point or larger (at least 10½ characters per inch).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

   [ ]      this brief has been prepared in a proportionally spaced typeface using _____ [*identify word processing program*] in _____ [*identify font size and type style*]; **or**

   [ ]      this brief has been prepared in a monospaced typeface using _____ [*identify word processing program*] in _____ [*identify font size and type style*].

(s)_____

Attorney for_____

Dated:_____

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case. In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form. Counsel has a continuing duty to update this information.

No. __14-2006__        Caption: __Berry v. LexisNexis Risk and Information Analytics Group, Inc.__

Pursuant to FRAP 26.1 and Local Rule 26.1,

Gregory Thomas Berry, Summer Darbonne, Rickey Millen, Shamoon Saeed, Arthur B. Hernandez,
(name of party/amicus)

Ericka A. Godfrey, Timothy Otten

who is _____ Plainitffs-Appellees ____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?  ☐YES ☑NO

2.    Does party/amicus have any parent corporations?                           ☐YES ☑NO
      If yes, identify all parent corporations, including grandparent and great-grandparent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                            ☐YES ☑NO
      If yes, identify all such owners:

10/28/2013 SCC                            - 1 -

4.  Is there any other publicly held corporation or other publicly held entity that has a direct
    financial interest in the outcome of the litigation (Local Rule 26.1(b))?    ☐YES ☑NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)    ☐YES ☑NO
    If yes, identify any publicly held member whose stock or equity value could be affected
    substantially by the outcome of the proceeding or whose claims the trade association is
    pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?    ☐YES ☑NO
    If yes, identify any trustee and the members of any creditors' committee:

Signature: _Susan M Rate_                    Date: ____October 7, 2014____

Counsel for: Appellees

## CERTIFICATE OF SERVICE
*************************

I certify that on _____Oct. 7, 2014_____ the foregoing document was served on all parties or their
counsel of record through the CM/ECF system if they are registered users or, if they are not, by
serving a true and correct copy at the addresses listed below:

Craig Marchiando, 1331 Lamar St., Ste. 1070          Richard Paul, III, 2000 Baltimore Ave., Ste. 100
Houston, TX 77010                                    Kansas City, MO 64108
                                                     Charles Molster, III - 1700 K St., NW
James Francis/Erin Novak/John Soumilias              Washington, DC 20006
Francis & Mailman, P.C, 100 South Broad St.          Kimball Anderson/William Ferranti - 35 W. Wacker Dr.
Philadelphia, PA 19110                               Chicago, IL 60601-9703
                                                     Samuel Issacharoff- 40 Washington SquareSouth,
James McCabe, 425 Market Street                      411J, New York, NY 10012
San Francisco, CA 94105-2482

_Susan M Rate_                                       ____Oct. 7, 2014____
(signature)                                          (date)

- 2 -